## WILLIAMS, TREASURER, *v.* EGGLESTON.[1]

ERROR TO THE SUPREME COURT OF ERRORS OF THE STATE OF
CONNECTICUT.

No. 210. Argued April 19, 20, 1898. — Decided May 2, 1898.

The legislation of the State of Connecticut whereby the franchise and property of a company which had constructed and was maintaining a toll bridge across the Connecticut at Hartford were condemned for public use, and the cost was apportioned between the State and the town of Glastonbury and four other municipal corporations in proportions determined by the statutes, and the proceedings had under this and subsequent legislation set forth in the statement of the case and the opinion of the court, did not violate any provisions of the Federal Constitution.

For three quarters of a century prior to 1887 the Hartford Bridge Company had under a charter from the State, (Priv. Laws Conn. vol. 1, p. 254, Resolve of October, 1808), maintained a toll bridge over the Connecticut River at the city of Hartford. It also maintained on the east side of the bridge and connected therewith a causeway across the lowlands adjacent to the river.

On May 19, 1887, the legislature of the State passed an act making said bridge and causeway a free public highway, and providing for the condemnation of the franchise and other property of the bridge company. (Pub. Acts Conn. 1887, chap. 126, p. 746.) Proceedings were directed to be instituted in the Superior Court of the county of Hartford for ascertaining the value of the property, determining the towns benefited by the establishment of the public highways, and apportioning the assessed damages. In this proceeding the damages assessed to the bridge company were $210,000, and apportioned between five towns, as follows: To the town of Hartford, ninety-five two hundred and tenths; East Hartford, sixty-six two hundred and tenths; Glastonbury, twenty-five two hundred and tenths, and the towns of South Windsor and Manchester each twelve two hundred and tenths.

---

[1] This case, as reported in the Connecticut Reports, was entitled *Morgan G. Bulkeley* et al. v. *Samuel H. Williams, Treasurer.*

The State, however, appropriated out of its treasury 40 per cent of the entire amount, to wit, $84,000, leaving the balance to be paid by these several towns, and such sums were paid. The act also provided that this public highway should thereafter be maintained by the towns assessed in proportion to their assessments, and that the first selectman of each of said towns should become *ex officio* member of a board, constituted a body politic and corporate, and charged with this duty of care and maintenance.

On June 29, 1893, the legislature passed an act providing that said bridge and causeway should thereafter "be maintained by the State of Connecticut at its expense;" and that the Governor, with the consent of the senate, should appoint three commissioners, who should constitute "a board for the care, maintenance and control" of such bridge and highway. (Pub. Acts Conn. 1893, ch. 239, p. 395.) The bridge was a covered wooden bridge, which had been in existence for many years. On November 13, 1894, that board, acting through a majority of its members, made a contract with the Berlin Iron Bridge Company for the construction of a new bridge to cost $275,900. Some work had been done and some material furnished by the company, when on May 17, 1895, the old wooden bridge was entirely destroyed by fire. A week thereafter, and on May 24, 1895, the legislature passed an act (Pub. Acts Conn. 1895, ch. 168, p. 530) repealing the act of June 29, 1893, and directing that thereafter the five towns which had been assessed for the benefits accruing from the establishment of the public highway should maintain that highway, each of them bearing the share of the expense thereof fixed in the assessment proceedings. By the same act a commission was appointed to hear and determine all legal claims and demands (that of the Berlin Iron Bridge Company being specially named) arising under or by virtue of any contract made and executed by the board appointed under the act of 1893. The act provided that if the award of such commission was less than $40,000 the comptroller should draw his warrant on the treasurer for the amount thereof, to be paid upon the delivery of proper receipts, releases and discharges. It also

provided that if any party, particularly the Berlin Iron Bridge Company, should not be satisfied with the decision of said commission it might within three years commence and pro-secute a suit against the State in the Superior Court of Hartford County for any legal claim, debt or demand arising under or by virtue of any valid contract made and executed by said board, and that in any event such Berlin Iron Bridge Company should be entitled to recover for all material furnished and all expenses of every kind actually incurred under said contract, including therein all legal and personal expenses; that on final judgment being rendered in such suit the comptroller should draw his order on the treasurer for the amount of the judgment; and further, if the contract which had been entered into should be declared valid and binding, the comptroller should carry out and complete the contract according to its provisions and draw his orders on the state treasurer for the cost thereof. Under this act the Berlin Iron Company presented its claim to the commission, which, on December 7, 1895, awarded to it the sum of $27,526. On December 13, 1895, the directors of the Berlin Iron Bridge Company voted to accept this award, and on the same day the company received the money and executed its release in the following words:

"$27,526.            HARTFORD, CONN., *December* 13, 1895.

"Received of the State of Connecticut the sum of twenty-seven thousand five hundred and twenty-six dollars in full of award made on the 7th day of December, 1895, by Hon. Dwight Loomis, Hon. Benj. P. Meade, comptroller, and Hon. George W. Hodge, treasurer of the State of Connecticut, acting as a commission constituted by chapter 168 of the Public Acts of 1895, and all other claims presented by this company to said commission are hereby withdrawn, and this payment is received in full satisfaction and discharge of all claims and demands of every nature which this company has or ought to have, arising under or by virtue of any contract made and executed by the commission appointed under chapter 239 of the Public Acts of 1893 with this company, and the within contract is hereby surrendered to the State of Connecticut."

On June 28, 1895, the legislature passed an act (Special Acts Conn. ch. 343, p. 485), the first section of which is as follows:

"Section 1. That the towns of Hartford, East Hartford, Glastonbury, Manchester and South Windsor be, and they are hereby created a body politic and corporate, with power to sue and be sued. under the name of the Connecticut River bridge and highway district, for the construction, reconstruction, care and maintenance of a free public highway across the Connecticut River at Hartford and. the causeway and approaches appertaining thereto, as described in a decree of the Superior Court of Hartford County, passed on the 10th day of June, 1889, in which decree said highway was laid out and established."

It also created a board of commissioners for such district, to consist of eight members, four from the town of Hartford and one from each of the other towns, who were given authority to maintain such free public highway and to erect new bridges along or upon said highway, to reconstruct, raise and widen the causeway and approaches appurtenant thereto or a part of said highway, at the expense of the towns composing the district. In case of a vacancy in the board the vacancy was to be filled by the town in which the retiring member resided. This board was authorized to issue the bonds of the district, if need be, to an amount not exceeding $500,000 for the construction of a new bridge or causeway. The burden of construction and maintenance of this public highway was distributed in a proportion different from that named in the original assessment proceedings, the town of Hartford being required to pay seventy-nine one hundredths, East Hartford twelve one hundredths and Glastonbury, Manchester and South Windsor each three one hundredths. For all expenditures the board was directed to draw warrants upon the several towns, and such orders were declared sufficient authority for the treasurer of each of said towns to pay the amounts named therein, and the board was authorized to apply to any court of competent jurisdiction for proper writs to compel the enforcement and execution of its orders. The board, having expended the sum of $500 in the ordinary support and main-

tenance of this highway, on September 14, 1895, passed a resolution apportioning the amount, and drew a warrant on the treasurer of the town of Glastonbury for the sum of $15, its proportion of the sum expended. The treasurer of that town refused to pay this order, whereupon, on October 16, 1895, the board presented an application to the Superior Court of Hartford County for an alternative writ of mandamus against him. The writ was answered by the treasurer, and in his answer he set forth, among other defences, that the act of May 24, 1895, repealing the act of June 29, 1893, was in violation of the Constitution of the United States, section 10, Article I, because it impaired the obligation of a contract; that the proceedings of the board were also in violation of the Fourteenth Amendment to the Constitution of the United States, because they deprived the towns and the citizens thereof of their property without due process of law, and denied to them the equal protection of the laws. The Superior Court rendered judgment *pro forma* in favor of the board, and directed the issue of a peremptory writ of mandamus. On appeal to the Supreme Court of the State this judgment was affirmed, June 25, 1896, *State ex rel Bulkeley* v. *Williams, Treasurer,* 68 Conn. 131, whereupon this writ of error was sued out.

*Mr. Lewis E. Stanton* and *Mr. John R. Buck* for plaintiff in error. *Mr. Olin R. Wood* was on their brief.

*Mr. Lewis Sperry* for defendant in error. *Mr. George P. McLean* and *Mr. Austin Brainard* were on his brief.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

Inasmuch as the plaintiff in error, when sued in the state court, specifically set up certain sections of the Federal Constitution as a bar to the proceedings against him, and the judgment of the state court was that they constituted no such bar, it is not open to question that this court has jurisdiction, and the motion to dismiss must therefore be overruled.

The first contention of·plaintiff in error is that the contract of November 13, 1894, made between the state-board and the Berlin Iron Bridge Company, was a valid contract, and that the two acts of May 24, 1895, and June 28, 1895, together with the orders and proceedings of the board of commissioners thereunder, are in violation of the tenth section of Article I of the Federal Constitution, because they impair the obligation of that contract. A sufficient answer to this contention is, that the contract, if valid — and upon that we express no opinion — was between the State of Connecticut and the Berlin Iron Bridge Company, and that they have fully settled all differences in respect thereto. The parties to a contract are the ones to complain of a breach, and if they are satisfied with the disposition which has been made of it and of all· claims under it, a third party has no right to insist that it has been broken. Counsel for plaintiff in error, conceding that an entire stranger cannot take advantage of any breach, insist that the town, though not a party to the contract, had an interest in its execution, for if it had been executed and the new bridge constructed and paid for by the State, the town would not now be under any obligations to assist in the construction of the new bridge. But this results, not from the mere adjustment between the State and the Berlin Iron Bridge Company, but by reason of the fact that the legislature, in the exercise of its unquestioned powers, has seen fit to cast the burden of the construction of a new bridge — which, as claimed, it had once assumed — upon the towns. Even if the contract had been carried into effect, according to its terms, the legislature might, at the time of passing the act of 1895, have provided that the cost of such construction should be borne by the towns specially· benefited thereby. It is not the breach of any contract, but an independent act of the legislature which casts the burden on the town of Glastonbury. The town is, therefore, an entire stranger to the contract, and this contention must be overruled.

Again, it is insisted that the plaintiff in error is denied the equal protection of the laws because these five towns are put into a class by themselves, organized into a single municipal

corporation, and separated from other towns in the State by being subjected to different control in respect to highways. But this overlooks the fact that the regulation of municipal corporations is a matter peculiarly within the domain of state control; that the State is not compelled by the Federal Constitution to grant to all its municipal corporations the same territorial extent, or the same duties and powers. A municipal corporation is, so far as its purely municipal relations are concerned, simply an agency of the State for conducting the affairs of government, and as such it is subject to the control of the legislature. That body may place one part of the State under one municipal organization and another part of the State under another organization of an entirely different character. These are matters of a purely local nature, in respect to which the Federal Constitution does not limit the power of the State. "Whether territory shall be governed for local purposes by a county, a city or a township organization, is one of the most usual and ordinary subjects of state legislation." *Kelly* v. *Pittsburgh*, 104 U. S. 78, 81. See also *Forsyth* v. *Hammond*, 166 U. S. 506, 518, 519, and cases cited in the opinion; 1 Dillon on Municipal Corporations, 4th ed. Vol. 1, p. 52, and following.

It is further contended that the acts of May 24, 1895, and June 28, 1895, are in conflict with that portion of the Fourteenth Amendment which forbids the depriving of any person of life, liberty or property without due process of law, because, first "they deprive the town of the right to perform its town duties by officers of their own choosing, which is contrary to the settled practice and law of the State, and arbitrarily destroys the right which those towns had before the constitution of Connecticut was adopted and which was not taken away by that instrument; and, secondly, because the acts provide for arbitrarily taking the property of the inhabitants of Glastonbury without proper notice of any proceeding under which the property is to be taken and without opportunity to be heard." Whatever may have been the practice of the State in the past it cannot be doubted that the power of the legislature over all local municipal corporations is unlimited save by the restrictions of the state and Federal constitutions; and

that these acts in no way violate any provision of the state constitution is settled by the decision of the state Supreme Court. *Backus* v. *Fort Street Union Depot Company*, 169 U. S. 557, 566, and cases cited. It is true there was a division of opinion between the members of the state Supreme Court, but such division, although a close one, does not prevent the opinion of the majority from becoming the decision of the court, and as such conclusive upon us. When the state court decides that municipal corporations within the territorial limits of the State are subject to the control of the state legislature, and that its act in creating for certain purposes a new corporation, and merging therein five separate towns, was valid, this court cannot hold that the state court was mistaken in its construction of the state constitution or in its declaration as to the extent of the power of the legislature over municipal corporations.

Neither can it be doubted that, if the state constitution does not prohibit, the legislature, speaking generally, may create a new taxing district, determine what territory shall belong to such district and what property shall be considered as benefited by a proposed improvement. And in so doing it is not compelled to give notice to the parties resident within the territory or permit a hearing before itself, one of its committees, or any other tribunal, as to the question whether the property so included within the taxing district is in fact benefited. *Spencer* v. *Merchant*, 125 U. S. 345, 356; *Parsons* v. *District of Columbia*, 170 U. S. 45. It should be noticed that no question is presented as to the necessity of notice before any property tax is cast upon the citizen. The only question is as to the power of the legislature to cast the burden of this improvement upon the five towns, towns which have been already judicially determined to be towns benefited thereby. Although the apportionment made between the towns was not that determined by the judicial proceedings, yet it was one of which certainly the town of Glastonbury cannot complain, for the judicial apportionment was as to it reduced by the legislative act. In casting this burden upon the towns the legislature did not proceed without a hearing from the

towns, for their representatives were in the legislature and took part in the proceedings by which the act was passed. So they had an opportunity to be heard, if such hearing was necessary, prior to the enactment of the law. These are all the questions made by counsel. We see nothing in the proceedings which can be said to be in violation of any provisions of the Federal Constitution, and therefore the judgment of the Supreme Court of Errors of Connecticut is

*Affirmed.*