C. J. WEST, et al, *Appellants,* v. TOWN OF LAKE PLACID, *Appellee.*

En banc.

Opinion filed February 6, 1929.

Petition for rehearing denied March 7, 1929.

*W. D. Bell* for Appellants;

*Treadwell & Treadwell* and *R. A. Rasco* for Appellees.

STRUM, J.—This is a statutory bond validation instituted in the Circuit Court for Highlands County pursuant to Sec. 3296, et seq., Rev. Gen. Stats. 1920, as amended, now Sec. 5106, et seq. Comp. Gen. Laws 1927. The bonds involved are an issue of $195,000.00 of general improvement bonds of the Town of Lake Placid, dated June 1, 1928, maturing serially in divers amounts from 1939 to 1957, inclusive, the issue consisting of 195 bonds of the denomination of $1,000 each, bearing interest at the rate of 6% per annum, payable semi-annually.

The issue is designed to pay the cost of the following projects of the obligor municipality; $32,000 for paying the Town's one-third of the cost of improving divers streets; $70,000 for establishing, constructing and installing a water

system; $10,000 for constructing and installing an electric light system; $75,000 for paying for work previously done and indebtedness previously incurred in the construction of a municipal golf course, and providing funds for the completion thereof; $8,000 for acquiring a fire truck.

The bonds are issued by authority of Chap. 12990, Acts of 1927. Pursuant to resolution passed at a regular meeting of the Town Commission, an election as required by Sec. 47 of Chap. 12990 was held on May 22, 1928, for the purpose of submitting to the qualified voters the question of whether or not said bonds shauld issue, the ballot being arranged so that the voters could vote separately upon the several projects as hereinabove set out. (See Antuono v. City of Tampa, 87 Fla. 82, 99 So. R. 324). It appears that a majority of the legally qualified voters who voted at said election voted in favor of the issuance of said bonds. The Town Commission, at a regular meeting on June 11, 1928, adopted an Ordinance, No. 26, providing for the issuance of the bonds and the expenditure of the proceeds for the purposes already stated.

When the proceeding to validate the bonds was instituted in the circuit court, the State attorney answered, admitting the validity thereof. Certain resident taxpayers intervened and demurred to the petition, their demurrer being overruled. The intervenors then answered. Portions of their answer were stricken on motion of the petitioner. Evidence was thereafter heard by the Circuit Judge on the issues made by the remaining portion of the intervenors' answer. On August 7, 1928, the Circuit Judge entered a final decree validating the bonds, from which decree the intervenors prosecute this appeal.

Appellants challenge the validity of the bonds upon divers grounds. They first contend that the bonds are issued primarily for the benefit of private corporations, in

violation of Article IX, Sec. 7, Constitution of Florida. In support of this contention, appellants introduced in evidence a contract aute-dating the passage of Chap. 12990, *supra,* which contract was executed, as parties of the first part, by the owners of some 20,000 acres of land now, but not then, embraced within the limits of the appellee municipality, and, as party of the second part, by the Lake Placid Club Company, a corporation. The general purpose of the contract was to induce and enable the Lake Placid Club Company to establish upon a tract of 3,000 acres located within the municipality, and to be donated to the Club Company by certain of the first party owners, a health and recreation resort designed to attract visitors and new residents to the community. The parties of the first part to the contract embraced fifteen land owners, five of whom are corporations, and the remainder individuals. Amongst other things, the parties thereto agreed to co-operate in procuring appropriate legislation to reorganize the existing municipality of Lake Stearns by changing its name to Lake Placid; by changing the name of of certain lakes and creeks in the vicinity; by altering its plan of government; to extend the city limits of the new Town of Lake Placid so as to embrace about 20,000 acres of land owned by the several parties of the first part to the contract; and to make appropriate provisions in the Charter of the new municipality protecting the parties to the contract in the taxing of their outlying lands embraced within the new municipality. It was further recited in the contract that the parties thereto believed that the plan embraced therein would greatly enhance the value of their lands and facilitate the sale thereof. Appellants, none of whom are parties to the contract just mentioned, assert that the enactment of Chap. 12990, *supra,* was procured by the land owners pursuant to this agreement and that the levying of a tax to pay the bonds would be a

tax primarily for the benefit of the corporate land owners who were parties to the agreement.

The bonds in question are general improvement bonds. No special assessments are involved. The record shows that although the corporations referred to own perhaps 50% of the area of the new municipality, and pay a proportionate amount of the taxes therein, the remainder is held in a diversity of ownership amongst many natural persons. It is not shown that the corporations involved will enjoy benefits other than those necessarily incidental to the general improvements contemplated; nor any benefits relatively disproportionate to that to be enjoyed by other property owners; nor any benefit disproportionate to the amount of taxes to be paid by the several property owners, including the corporations, to retire the bonds. Nearly all of the corporately owned land in question is now owned by the Lake Placid Land Company. The evidence shows that only "a very small part" of the land lies in the vicinity of the contemplated improvements, the holdings of the company lying largely outside of the business part of the town and consequently remote from the vicinity of the improvements. While the Land Company owns some of the lands adjacent to the proposed golf course on the west side, a great many individuals, many of them residing in other cities and States, own the remaining lands bordering the golf course, the latter ownerships aggregating the great majority of the area of the lands bordering upon or near the golf course. The ownership appears to be quite diversified.

The language of this Court, speaking through Mr. Justice WHITFIELD, in Hunter v. Owens, 80 Fla. 812, 86 So. R. 839, is controlling upon the facts disclosed by this record:

"In testing the validity of a statute with reference to the facts and circumstances upon which it is to operate, the validity of the statute does not depend upon the prepon-

derance of evidentiary considerations; but the statute stands unless it conclusively appears that there are or can be no conceivable circumstances upon which it can validly operate or that under no circumstances can it operate or be effective to accomplish the intended purpose, without violating organic rights. The propriety of action taken under the statute is subject to judicial review. While under the Constitution 'no tax shall be levied for the benefit of any chartered company of the State' (Sec. 7, Art. IX), yet, if a public improvement that is afforded by tax levies does merely incidentally benefit private corporations along with other persons, the Constitution is not violated in levying the tax for the public purpose, for the law contemplates that corporations shall participate in the burdens and benefits of taxations within appropriate limitations.'' · Special assessment bonds were there under consideration, but the principle is equally applicable to a tax to retire general improvement bonds.

Appellants also complain of the provisions of Sec. 4 of Chap. 12990, relating to the manner of electing the Town Commission. Amongst other things, that section provides in effect that the town shall be governed by a commission of five members, three of whom, to be known as "General Commissioners," are to be elected by the voters at large. The fourth and fifth, to be known as "District Commissioners," are to be elected to represent the newly annexed territory lying to the east and west of the predecessor municipality of Lake Stearns, now embraced within the new municipality, Lake Placid. These two commissioners are to be chosen by the three general commissioners from two nominees designated in each district by taxpayers representing a majority in value of the property in those districts accordinig to the assessment thereof for purposes of State and county taxation, the voters at large having no direct voice

in the election of the two district commissioners. These two districts constitute a large part of the territory annexed to the reorganized municipality, and substantially all of the lands in the district are owned by two of the corporations who were parties to the agreement hereinbefore referred to, or their grantees. Many of the important powers of the town, including the power to impose taxes, to expend public funds, and to make improvements of the character here under consideration, may be exercised only upon the affirmative vote of the five commissioners, thus giving the District Commissioners, who are at present concededly persons connected with and interested in the corporations owning substantially all the land in those districts, most of which is ''outlying'' land, a veto power in the exercise of those powers of government. Under the terms of the charter, however, each of the three general commissioners, elected by the voters at large, have a similar veto power. This phase of the charter appears to be in accordance with the desire of the land-owner corporations, as referred to in the agreement, to protect themselves in this manner in the taxation of their outlying lands, since the corporations have not vote at the polls.

Appellants urge that the passage of the Charter Act in this form was inspired by the influence of persons interested in the corporations. The constitutionality of a Statute, however, is not to be tested by influence brought to bear to secure its enactment, or by motives or purposes which may have actuated the Legislature. At least, in the absence of fraud or the most palpable abuse of power, if not always, those questions are matters of legislative, not judicial, concern. Polk v. Mutual Reserve, etc., 207 U. S. 310, 52 L. Ed. 222; Calder v. Michigan, 218 U. S. 591, 54 L. Ed. 1163; In re: Mt. Sinai Hospital, 219 N. Y. Supp. 505.

Appellants further claim that the method just mentioned of selecting the two District Commissioners affords the land owners of the two Districts an unjust preference and superior power in the governmental affairs of the municipality, thereby creating an unlawful discrimination in their favor. While much might be said pro and con upon the merits of that proposition, the record does not disclose whether, if such preference exists, the appellants are the beneficiaries or the victim thereof, for it does not appear by the evidence but that the appellants' lands are situated in the Districts alleged to be favored. So upon the record, appellants' rights to raise the questions is doubtful for that reason alone. Adams v. American A. Chemical Co., 78 Fla. 362, 82 So. R. 850; Land v. State, 77 Fla. 212; In re: De-Woody, 113 So. R. 677; State v. City of Sarasota, 109 So. R. 473. But pretermitting that question, there ensues another well established rule that is fatal to appellants' contention.

The ultimate effect of appellants' contentions as to that portion of the Charter now under consideration is to question the power of the Legislature to grant a municipal franchise embracing the method of selecting the municipal governing body just stated, and other powers assailed, and to further question the right of this municipality to exercise the franchise so granted. It is charged that the Commissioners have not only acted irregularly and contrary to the terms of the Charter Statute, but appellants go further and question their right to act at all. It is virtually a charge of usurpation, and thereby becomes a collateral attack by individuals upon the existence of the municipality by questioning the validity of its incorporation. Where an attempted incorporation of a municipality is an absolute nullity, such incorporation may be collaterally attacked. In this instance, however, acting under at least color of au-

thority from the Legislature found in the passage of Chap. 12990, *supra,* this municipality apparently in good faith has taken the necessary steps to put its Charter into operation; has elected its officers, has assumed the duties of local government under its Charter, and has otherwise engaged in an active user of the franchise; all of which has been acquiesced in by the inhabitants of the municipality until the institution of this proceeding. Thus the municipality has become at least a municipality *de facto.* Tulare Irr. Dist. v. Shepard, 185 U. S. 1, 46 L. Ed. 773; Constitution v. Chestnut Hill Cemetery Association, 71 S. E. Rep. 1037; Cooper v. Town of Valley Head (Ala.), 101 So. R. 874, 43 C. J. 98. Being a *de facto* municipality, its existence can be challenged only by the State in a direct proceeding, such as *quo warranto,* instituted through its Attorney General, or through such other person as may be lawfully authorized or entitled, by reason of the nature of the rights involved, to invoke the remedy. Tulare Irr. Dist. v. Shepard, *supra.* Until its existence is so challenged and terminated by judgment of ouster, such municipality may continue to exercise its powers and discharge its governmental functions, and those acts must be respected by the public. While some of the powers attempted to be granted to this municipality may not be valid, its existence as a municipality can not be collaterally assailed in a proceeding of this nature. Merrell v. St. Petersburg, 74 Fla. 194, 76 So. R. 699; Bateman v. Florida Commercial Co., 26 Fla. 423, 8 So. R. 51; Enterprise v. State, 29 Fla. 128, 10 So. R. 740; State v. Sarasota, 109 So. R. 473; Morgan's Ect. R. R. v. White, etc. (La.) 68 So. R. 130; Story Piano Co. v. Ottawa Circuit Judge, 179 N. W. Rep. 254; Pefifer v. Klug, 219 Pac. Rep. 498; Coe v. City of Dothan (Ala.) 94 So. R. 186; 43 C. J. 99, 619. Of course, defenses which do not involve the question of corporate existence, and which could be

made regardless of whether or not the municipality is a duly constituted corporation, are not precluded by the rule just stated. In Stewart v. Daytona, etc. District, 114 So. R. 545, the existence of the District was not under consideration, but the actions of the commissioners in issuing the bonds were held illegal because the Statute under which they acted transcended legislative authority in that it attempted to delegate to a statutory administrative board unlimited powers of taxation. Nor was the corporate existence of the county in question in Dade County v. State, 116 So. R. 72. The bonding act there involved failed because the method provided for the creation of the administrative board which was to carry out the project and expend the fund violated organic limitations, and as the elimination of that board was fatal to the project, the entire Statute necessarily failed.

The method of electing the Town Commissioners, hereinbefore described, is not repugnant to the equal protection clause of the Fourteenth Amendment to the Federal Constitution. It must be borne in mind that mere irregularity alone, or the mere lack of abstract symmetry, does not offend against the Fourteenth Amendment. In order to become obnoxious to that amendment, a selection or classification by a State Legislature must be clearly arbitrary and unreasonable, having no just relation to real differences in the subject matter of the regulation. The matter of classification is a practical one, dependent upon experience. People v. Zimmerman, 73 L. Ed. (U. S.) 52; International Harvester Co. v. Missouri, 234 U. S. 199, 58 L. Ed. 1276; Batchel v. Wilson, 204 U. S. 396, 51 L. Ed. 357; Georgia R. & P. Co. v. Decatur, 262 U. S. 432, 67 L. Ed. 1065. Instances are frequent in which one or more of the members of the governing bodies of municipalities are elected by the voters of a designated district, the voters of the other

districts having no voice in their selection, the members thus elected constituting a majority, or in some instances all, the members of the governing body. In many municipalities, the governing power is vested in two bodies, as a Commission and a Council, the members of one of which are elected at large, and of the other from districts or wards, the coordinate action of both bodies being required upon matters of taxation and finance. One body then functions as a check upon the other, and a proposed measure might be defeated by the adverse vote of certain members elected from districts, in the election of whom as members of the governing body the voters of other districts, or of the municipality at large, had no voice. The plan now before us is not essentially dissimilar in principle to the plans just mentioned, which are universally conceded to be constitutionally sound. Though each of the district commissioners of this municipality has a veto power in the imposition of taxes and the expenditure of public funds, each of the general commissioners elected by the voters at large have the same power. The voters at large have the numerical advantage in potential veto votes against unwise taxation or expenditure of public funds. The negative vote of any one commissioner, whether general or district; operates uniformly as to all taxpayers by defeating the proposed measure. The diversified method of selecting the commissioners does not afford any opportunity for subjecting taxpayers to any inequality, lack of uniformity, or other unjust discrimination in matters of taxation. Sections 1 and 5 of Article IX of the Constitution would preclude any construction being placed upon the powers of the Commission which would result in any lack of equality or uniformity in the imposition of taxes. The plan of electing the commissioners relates solely to the method by which the citizens of the municipality shall exercise their franchise as voters in the choice

of commissioners, in the regulation of which the Legislature possesses very broad powers. State v. Dillon, 32 Fla. 545, 14 So. R. 388, 22 L. R. A. 124; State v. Johns, 109 So. R. 228; Jacksonville v. Bowden, 67 Fla. 181, 64 So. R. 769; Peek v. Matthews, 85 Fla. 54, 95 So. R. 234.

In its purely governmental relations, a municipality is a subordinate political sub-division of the State created for purposes of local government. Waller v. Osban, 60 Fla. 268, 52 So. R. 970; Hardee v. Brown, 56 Fla. 377, 47 So. R. 834. The method and manner in which the right to vote shall be exercised in local municipal elections is peculiarly within the regulatory powers of the Legislature in view of Art. VIII, Sec. 8 of the Constitution assigning the power to the Legislature "to establish and to abolish municipalities, 'provide for their government', to prescribe their jurisdiction and powers, and to alter and amend the same at any time". This power is plenary except as restrained by other provisions of the Constitution, State or Federal. Even if the equality clause of the Fourteenth Amendment extends to the matters under consideration, we see therein no violation of either its spirit or letter. See Mason v. Missouri, 179 U. S. 328, 45 L. Ed. 214; Carrithers v. City of Shelbyville, 104 S. W. R. 744, 17 L. R. A. (N. S.) 421; Taggart v. Claypool, 44 N. E. R. 18, 32 L. R. A. 586; Williams v. Eggleston, 170 U. S. 304, 42 L. Ed. 1047; People v. Gordon, 113 N. E. R. 864; Hope v. New Orleans, 30 So. R. 842; Chancler v. Neff, 298 Fed. 515; Atty. Gen. v. Pelletier, 134 N. E. R. 407, 414; McPherson v. Blackner, 52 N. W. R. 473; 16 L. R. A. 475; idem., 146 U. S. 1; 36 L. Ed. 869; Minor v. Happersett, 21 Wall. (U. S.) 162; 22 L. Ed. 627; Pope v. Williams, 193 U. S. 621; 48 L. Ed. 817; Sweeney v. Coulter, 58 S. W. R. 784; 12 C. J. 1149; 20 C. J. 104, et seq.

Appellants also contend that the election hereinabove

mentioned was invalid because voting therein was restricted to freeholders. Sec. 47 of Chap. 12990, *supra*, provides: "Before such bonds shall be issued an election shall be called by the commission and notice of such election shall be published, etc. * * * If a majority of the legally qualified voters, voting at said election, shall vote for issue of said bonds, then commission may by ordinance provide for issuance of said bonds. * * *" No provision in the Charter Act of this municipality (Chap. 12990) relating specifically to the qualifications of voters in bond elections has been called to our attention. Chap. 9294, Laws of Florida (now Sec. 250, Com. Gen. Laws 1927), was approved June 7, 1923. That chapter provides: "It shall be unlawful for any person to vote or participate in any county district, or other bond election held in this State, who is not a freeholder therein and who is not otherwise qualified as a voter therein." Appellants contend that since the Charter Act of this municipality became a law on June 6, 1927, and contained a clause repealing all laws in conflict therewith, it repealed Chap. 9294, *supra*, so far as this municipality is concerned, resting their contention upon Fergusson v. McDonald, 66 Fla. 494, 63 So. R. 915. There is, however, no inconsistency or conflict between the special and general laws just mentioned. The special law, the Charter Act of this municipality, does not undertake to prescribe the qualification of those who shall vote in bond elections in the municipality, but contents itself with the provision that the bonds shall be issued "if a majority of the legally qualified voters, voting at said election, shall vote for issue of said bonds," leaving the matter of qualification to the provision of the existing general law on the subject, Chap. 9294, *supra*, which excludes all but freeholders. There is a clear field for the operation of both statutes without conflict. In Sec. 47 of the Charter Act, the Legislature was dealing ex-

clusively with the matter of bond issues by this municipality, not ordinary elections of a political nature, and when without specifically prescribing the qualifications of those who should be entitled to vote in such bond elections, the Legislature provided for submission of the question of the issuance of bonds to the ''legally qualified voters,'' one of the qualifications contemplated was that such voters should be freeholders as provided by the existing general law. In order for a special law with reference to the government of a municipality to control over a general law under Article III, Sec. 24, Constitution of Florida, the two laws must be inconsistent. City of St. Petersburg v. Pinellas County Power Co., 87 Fla. 315, 100 So. R. 509; City of Apalachicola v. State, 93 Fla. 921, 112 So. R. 618; State v. Avon Park, 118 So. R. 223. There being no inconsistency between Chap. 9294 and Chap. 12990, *supra,* with reference to the qualifications of those entitled to vote in bond elections in this municipality, the former statute is not repealed by the latter as to this municipality. See Sanders v. Howell, 73 Fla. 563, 74 So. R. 802; City of Tampa v. Prince, 63 Fla. 387, 58 So. Rep. 542; State v. Sanders, 79 Fla. 835, 85 So. R. 333; Anderson v. City of Ocala, 87 Fla. 257, 99 So. R. 667.

The municipality is indebted to Lake Placid Land Co. in the sum of $35,000, evidenced by promissory notes of the municipality, for money loaned by the Land Company and used by the municipality in preliminary work upon the proposed golf course. The municipality is also indebted to divers other persons for work done and materials furnished for the same purpose. Appellants further contest the validation of the bonds because it is anticipated by them that the debt to Lake Placid Land Co. will be paid from the proceeds of the bonds, which action appellants claim would be illegal, for divers reasons, amongst which are that the

bonds for the golf course thus in effect, become refunding bonds in part and are not issued in accordance with the General Statute on that subject, Chap. 11855, Acts of 1927. Even if this objection relates to the validity of the bonds as distinguished from an illegal expenditure of the proceeds, as to which appellants would have their appropriate remedy (see Perry v. Panama City, 67 Fla. 285, 65 So. R. 6; City of Tampa v. Salamson, 35 Fla. 446, 17 So. R. 581), and even if Chap. 11855, *supra,* would otherwise be applicable (see State v. Avon Park, 118 So. R. 223; City of Apalachicola v. State, *supra,*) the objections can not be sustained as to these bonds. The Charter Act (Secs. 3-H and 48) expressly authorize the Town to acquire and maintain golf courses. When proper authority is granted by the Legislature, the ownership, maintenance and operation of public golf courses is a permissible municipal function under the Costitution, Art. 9, Sec. 5. See City of Bradenton v. State, 88 Fla. 381, 102 So. R. 556; 36 A. L. R. 1297; Peterson v. Town of Davenport, 90 Fla. 71, 105 So. R. 265; 46 A. L. R. 602, note 673-707; Earle v. Dade County, 92 Fla. 432, 109 So. R. 331; Bolick v. State, 117 So. R. 387. The Charter Act, Sec. 92, further expressly authorizes the municipality to borrow not to exceed $100,000.00 to provide for necessary expenses either for the commencing or carrying on of work on the golf courses or other public work until sufficient taxes are collected. Sec. 47 of the Charter Act also provides: ''Proceeds of sale of such bonds may be used for any purpose that shall be declared by five votes of the Commission to be of public nature or for public welfare or necessity.'' The Town Commission, by unanimous vote, has formally declared the payment of the indebtedness aforesaid to be ''for public benefit, of public nature and for public welfare.'' The last mentioned provision of the Charter does not, of course, confer unlimited authority

on the Commission to determine what is a public municipal function, nor is the finding of the Town Commission conclusive of the matter. That question is always for ultimate judicial determination, though due weight will be given to a determination by legislative authority. See City of Bradenton v. State, and cases following the same, *supra*.

Here we have a case in which the municipality has exercised express authority to borrow money to pay the cost of preliminary work upon an expressly authorized and permissible municipal project and proposes to complete the project and pay the cost of preliminary work from the proceeds of bonds issued for that express purpose pursuant to express authority. In view of the express Charter provisions, the fact that the municipality may contemplate using a part of the proceeds of the bonds to retire expressly authorized preliminary indebtedness upon the project, presents no such excess or abuse of authority in the issuance of the bonds as to render the same invalid. See Perry v. Panama City, 67 Fla. 285, 68 So. R. 6; Merrill v. St. Petersburg, 74 Fla. 192, 76 So. R. 699; State ex rel. Wilkes v. Bradenton, 92 Fla. 793, 110 So. R. 127; Lewis v. Leon County, 91 Fla. 118, 153, 107 So. R. 146, 158. If any part of the preliminary indebtedness proposed to be paid was not incurred within the limitations of the town's authority, or is invalid for any other reason, an affected taxpayer may prevent the disbursement in an appropriate proceeding. These bonds do not become refunding bonds because of the proposed payment from the proceeds of the preliminary indebtedness here in question, but they are original bonds for the purpose, in part, of originally funding or paying off an expressly authorized floating debt incurred in furtherance of a permissible and expressly authorized municipal project. See Hardin v. McFarlan, 82 Ill. 138; and Commissioner v. Newell, 80 Ill. 587, modifying City of Galena v.

Corwith, 48 Ill. 423. It seems to be the weight of authority that when a City is expressly authorized to borrow money to pay the preliminary expense of inaugurating a permissible and expressly authorized municipal project, and is also authorized to issue bonds to pay the cost of the project, such city, in the absence of any other restraining provisions of law, may issue negotiable bonds for the authorized purpose and out of the proceeds pay off a floating debt lawfully incurred by virtue of such express authority and in furtherance of the authorized project for which the bonds are authorized to be issued. See Morris & Whitehead v. Taylor, 49 Pac. Rep. 660, and authorities therein cited; National Life Ins. Co. v. Mead, 82 N. W. Rep. 78; City of Huron v. Second Ward Savings Bank, 86 Fed. 272; McQuilling Munic. Cor. (2d Ed.) Secs. 2429, 2441; Dillon Munic. Corp. Sec. 939; Simonson, Municipal Bonds, Sec. 125. The rule just stated does not conflict with the decisions in City v. Brenham v. German-American Bank, 144 U. S. 173, 36 L. Ed. 390, and in Hill v. Memphis, 134 U. S. 198, 33 L. Ed. 887. In the first, the City possessed only express authority to borrow for corporate purposes. A majority of the Court held that the power to issue negotiable bonds could not be implied from the mere power to borrow. In the second, the City was also without express power to issue bonds, and the Court held that the power did not exist by implication. Nor does the rule just stated conflict with the generally accepted doctrine that a municipality is without power to issue negotiable refunding bonds in the absence of express authority so to do.

A further objection based upon the anticipated payment of the loan from Lake Placid Land Co. rests upon the contention that because one of the town commissioners who voted for the issuance of bonds, his vote being essential to their issue, was at the time the manager of the land com-

pany, such commissioner occupied a fiduciary relation to both the debtor municipality and the creditor corporation, and from that premise it is contended that his action in voting upon the issuance of the bonds was inviolation of public policy. Lainhart v. Burr, 49 Fla. 315, 38 So. R. 711; Dillon Munic. Corp., Sec. 772. See also in this connection Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. edi. 328.

This objection, however, cannot be entertained in this proceeding because, in its last analysis, it pertains not to the validity of the bonds but to the propriety and legality of a proposed disbursement of a portion of the proceeds. The object for which the bonds are to be issued is a permissible and valid one. Payment of the loan from the land company is not one of the expressed purposes for which the bonds are to be issued. That action is merely anticipated by appellant. There exists other preliminary indebtedness to divers other persons the legality of the payment of which from the proceeds of the bonds is not questioned by appellants. Even if the dual capacity of the commissioner in question offends against public policy so as to taint the transaction between the land company and the town, a question which we do not now consider, that relationship would not preclude a vote by the Commissioner upon the issuance of bonds for a valid purpose, in the issuance of which such commissioner cast an essential vote. If from the proceeds of bonds so issued, an illegal expenditure is attempted, relief by appropriate proceedings is available to affected taxpayers. If the action of the commissioner is illegal because of his dual relationship, it is the illegal expenditure of the proceeds, and not the issuance of the bonds, that would violate public policy, where, as here, the bond issue is for a valid public purpose, and the expenditure in question is merely anticipated and incidental, and involves only a relatively minor portion of the proceeds. See Perry

v. Panama City, 67 Fla. 285, 65 So. R. 6; City of Tampa v. Salamonson, 35 Fla. 446, 17 So. R. 581; Lewis v. Leon County, 91 Fla. 118, 149, 107 So. R. 146, 157. If the basic or essential purpose of the bonds, as distinguished from a merely anticipated and incidental disbursement of a portion of the proceeds, was to pay off an illegal-indebtedness it might be competent to consider the question in a validation proceeding.

Appellants' contention that the period of maturity of the fire truck bonds is excessive when compared to the probable life of that utility, is not supported by any evidence as to what the probable useful life of the fire truck will be. We cannot take judicial notice of the probable life of the fire truck, even when measured by the most remote maturity of the fire truck bonds, which is eighteen years. It follows therefore that the objection cannot be sustained.

We have carefully examined all other matters assigned by appellants in objection to the bonds, but find no ground for reversal.

The decree appealed from is affirmed.

TERRELL, C. J., AND WHITFIELD, ELLIS, BROWN AND BUFORD, J. J., concur.