122 So.2d 190 (1960)
STATE of Florida, Appellant,
v.
SUWANNEE COUNTY DEVELOPMENT AUTHORITY OF SUWANNEE COUNTY, Florida, Appellee.
Supreme Court of Florida.
July 20, 1960.
William Randall Slaughter, Live Oak, for appellant.
Alfred A. Airth, Live Oak and Patterson, Freeman, Richardson & Watson, Jacksonville, for appellee.
O'CONNELL, Justice.
This is an appeal by the State from a final decree validating "revenue-anticipation" certificates in amount of $100,000 proposed to be issued by the Suwannee County Development Authority, hereinafter referred to as the Authority.
*191 The Authority, a body corporate and politic, was created by ch. 59-1903, Laws of Fla., Special Acts of 1959 "for the purpose of performing such acts as shall be necessary for the sound planning for, and development of Suwannee County." The creating statute empowered the Authority to acquire real property, to construct "projects" on such property, "and to lease or make contracts with respect to the use or disposition of same in any manner the authority deems to its best advantage."
"Project" is defined in the creating statute to mean and include the acquisition of lands, properties and improvements for development, expansion and promotion of industry, commerce, agriculture, natural resources and vocational training and the construction of buildings and plants for the purpose of selling, leasing or renting such structures to private persons, firms or corporations.
The Authority is given the power to issue "revenue-anticipation" certificates for the purpose of paying all or any part of the cost of any project of the Authority. It is also given authority to accept grants, contributions, and loans from the state, county, or cities in the county.
The same Legislature which created the Authority established a revolving fund to be called the Suwannee County Development Authority Fund and directed the Board of County Commissioners of that county to pay into said fund from the county's share of the race track funds distributed to the counties by the State $30,000 per year for three years and $10,000 per year thereafter, said monies to be used by the Authority in carrying out its functions as prescribed by law. Ch. 59-727, Laws of Fla., Special Acts of 1959.
The State opposed the validation of the certificates by the trial court principally on the ground that the proceeds thereof are to be used for purchasing real estate and constructing a building or buildings thereon, which buildings will be leased to a private business. This, said the State, would violate Section 10, Article IX, Florida Constitution, F.S.A.
The State takes the same position on this appeal.
On the other hand the Authority contends that the use of the proceeds of the certificates for purchase of land and construction of buildings for use by private enterprise is not a violation of Section 10, Article IX, Florida Constitution, since this purchase, construction, and leasing is only a first step in a much larger overall "project" or development. The Authority reasons that since the overall project is a valid public purpose incidental benefits to or use of a portion of the project by private interests does not destroy the public nature of the whole project. It relies heavily on State ex rel. Ervin v. Cotney, Fla. 1958, 104 So.2d 346 for support of its position.
For the reasons set forth below we must agree with the State that the certificates should not be validated because the proposed use thereof would violate Section 10, Article IX, Florida Constitution.
The evidence in this cause, particularly the testimony of the members of the Authority, shows that insofar as these certificates are concerned the only plan or program envisioned by the Authority at the time of the proceedings in the trial court was the purchase of land and construction thereon of a building or buildings for lease to a private industry which the Authority hoped to bring into the county. The testimony showed clearly that the only definite plan made by the Authority was to use all, or certainly the major portion, of the proceeds of the certificates for the purchase of land and construction of such buildings, although there were no definite plans as to what land would be purchased, what buildings would be constructed, or to what firm or person they would be leased. The testimony was to the effect that the Authority felt it could not make plans or devise a program until it knew whether the funds *192 from the proposed certificates would be available. The evidence shows that the Authority had not yet devised any broad program or "project."
In fine it becomes quite clear that insofar as the issue of certificates involved here is concerned it is intended that they be used not for a public purpose, but for a private one, i.e. the purchase of land and erection of improvements for lease to a private enterprise.
In the Cotney case relied upon by the Authority this Court made clear that public funds may not be used in this manner, saying at page 348 of 104 So.2d:
"* * * It must, however, be taken as settled law under the Adams decision and the previous decision of this court in State v. Town of North Miami, Fla. 1952, 59 So.2d 779, that a public body cannot use its power and its funds to acquire property, either by purchase or by the exercise of the power of eminent domain, for the sole purpose of making such property available to private enterprises for private use."
As we see it the Authority can, because of the difference in factual situations, draw no comfort whatsoever from the Cotney case or any others known to us.
In the Cotney case it is important to note that there was no proposed issue of revenue certificates before this Court. In that case the Clay County Development Authority, which was created by a special act of the Legislature almost indentical to that which created the Authority here involved, had already acquired a large tract of surplus land from the federal government. It proposed to develop that land as one project to include an airport and golf course with the remainder to be leased or sold to private enterprise for commercial use. This Court held that there was nothing in the record to show that the leasing or selling to private enterprise for private use of a portion of the lands was the primary purpose for the acquisition of the lands. Rather the court held the private use was only an incident thereto. The record in this case conclusively shows that private use is the primary purpose for the acquisition of the lands and construction to be accomplished with the proceeds of the certificates here involved.
The basic question involved in the Cotney case was the validity of that part of ch. 57-1226 Special Acts of Florida, 1957, which empowered the Clay County Development Authority to purchase lands and construct improvements thereon for sale or lease to private interests for private use. This Court answered that question in light of the facts of that case, only, saying at page 349 of 104 So.2d:
"* * * When construed as authorizing the sale or lease for industrial and commercial purposes of a portion, only, of a tract of land acquired as a singe project encompassing recognized public purposes as the primary object of the acquisition; or as authorizing the construction of improvements on such property for utilization by private enterprises as an incident to and in furtherance of a primary and recognized public purpose, * * * we find no constitutional infirmities in the Act."
Thus it is obvious that although the Court approved the validity of an act granting such an Authority the power to purchase, construct, and lease to private enterprise it severely restricted such authorization to those instances where the private use was only incidental to a public purpose and public use of the remaining greater portion of the lands involved.
The record in this cause moves us to comment on another aspect of validation proceedings, generally.
In the petition for validation of the certificates in this cause the Authority in essence alleged that it was empowered to issue revenue certificates, that the Board of County Commissioners had passed a *193 resolution pledging a portion of the race track funds to the payment of the principal and interest of the proposed certificates, and that the Authority had adopted a resolution providing for the issuance of the certificates "to finance the cost of acquiring, erecting and constructing a portion of the program of the * * * Authority."
The Order to Show Cause or Rule Nisi published in usual form required the public to show cause why the certificates should not be validated.
Yet it would be difficult, if not impossible, for a member of the public to show cause why the petition for validation in this cause should not be validated on the ground that the Authority was not empowered to use the proceeds of the certificates in the manner contemplated since the intended use of the funds was stated to be "to finance the cost of acquiring, erecting and constructing a portion of the program of the * * * Authority", with no description being given of the program or portion thereof to be financed by the certificates.
Ch. 75, F.S.A., the statute prescribing the procedures in validation cases such as this, apparently does not require either the authorizing resolution or the petition for validation to set out specifically the purpose for which the proceeds of bonds or revenue certificates are to be expended.
Stated generally, the purpose of validation proceedings is primarily to test the power of the issuing agency to issue the bonds or certificates or to incur the proposed debt. State v. City of Tampa, Fla., 1957, 95 So.2d 409. When the object or purpose for which the proceeds of bonds are to be used is valid, validation proceedings may not be used to test the propriety or regularity of a proposed disbursement. West v. Town of Lake Placid, 1938, 97 Fla. 127, 120 So. 361.
But the fact that the issuing agency is empowered to issue revenue certificates or bonds does not authorize the issuance of certificates for a purpose for which it cannot lawfully expend monies. See City of Ottawa v. Carey, 1883, 108 U.S. 110, 2 S.Ct. 361, 27 L.Ed. 669.
Therefore, validation proceedings involve a determination not only of the authority of an agency to issue bonds or revenue certificates, but also whether the agency may lawfully expend the proceeds for the contemplated purpose.
Thus, common sense impels the conclusion that the issuing governmental agency should set forth in the petition for validation of bonds or revenue certificates a description of the purpose for which the proceeds are to be used, which description should be sufficiently detailed to enable a member of the public and the state to determine whether the issuing agency can lawfully expend public monies therefor.
Without this interpretation of the allegations required in a petition for validation the provisions of Sections 75.05 and 75.06, F.S.A. requiring that a rule nisi be issued, served upon the state attorney, and published, falls far short of the intended purpose, which is to enable the state and the citizens involved to determine whether the issuing agency has not only the authority to issue the bonds or certificates but also the authority to expend the proceeds for the purpose contemplated.
What we have said concerning the sufficiency of a petition for validation is not intended to and must not be taken to reflect in anywise upon able counsel for the Authority. The petition here involved follows the customary form used generally in such proceedings in this state. Under existing practice and statutes it must be said to be legally sufficient and we do not hold it to be insufficient.
What we do say is that in the future, particularly where the authority of the issuing agency is as broad as in this case and more particularly where it is authorized to do acts which, depending upon the manner *194 in which done, could be held to be invalid, petitions for validation of bonds and revenue certificates should set forth in reasonable detail the purpose or purposes which will be accomplished with the proceeds.
This discussion of the contents of a petition for validation does not control our decision in this cause and is intended only as a guide to the bench and bar in future cases.
For the reason that the proceeds of the revenue anticipation certificates involved herein are proposed to be used for private and not a public use we hold that their issuance is in violation of Section 10, Article IX, Florida Constitution, and for this reason the final decree validating them is reversed.
THOMAS, C.J., and HOBSON and DREW, JJ., concur.
THORNAL, J., concurs specially.
TERRELL, J., dissents.
ROBERTS, J., heard the argument but did not participate in the decision.
THORNAL, Justice (concurring specially).
I concur in the judgment of reversal for the reason that the revenue bond resolution omits entirely a commitment of the proceeds to any reasonably definite project within the limits of appellee's statutory authority. Conceivably, a legitimate plan could be developed. However, it is impossible to determine from the resolution or the validating decree the nature of the project which appellee contemplates undertaking. The testimony of the members of the appellee Authority is entirely speculative as to how or for what purpose the revenue bond proceeds will be used. Not a single member of the Authority appeared to have any specific or reasonably definite idea as to what would be done with the money. It is possible that the money could be applied to a public purpose under the resolution. However, the entire proceeding is totally lacking in any showing that the money will be used for a purpose contemplated by the authorizing statute. As I interpret the opinion of the majority, it holds that the construction and leasing of a warehouse to a private concern would in all events, be illegal. I am not willing to go this far. It appears to me that in view of conditions in the area invloved, such a project in and of itself could under appropriate circumstances constitute a public purpose that would justify the expenditure of public funds. In this particular instance, however, there is no showing at all to support such a conclusion. I, therefore, concur in the judgment of reversal.
TERRELL, Justice (dissenting).
This appeal is from a final decree validating Revenue Anticipation Certificates proposed by Suwannee County Development Authority in the sum of $100,000. They will hereinafter be referred to as certificates.
Petition to validate the certificates was duly filed, order to show cause was entered October 6, 1959, publication was made, the state attorney answered the petition, on the issues so made evidence was taken, and at final hearing December 14, 1959, the chancellor promulgated a decree validating the certificates. This appeal is from the final decree so entered.
The first question presented is whether or not the issuance of certificates by the Authority for the purpose of purchasing real estate upon which improvements will be erected and leased to a private concern constitutes a valid public purpose as contemplated by Chapter 59-1903. Does the issuance of such certificates violate Section 10, Article IX, Florida Constitution?
This is a question with a double aspect. The first aspect has to do with the power of the Authority to issue certificates, the proceeds of which are to be used to purchase *195 real estate upon which improvements will be erected and leased to private lessees. The second aspect is whether the issuance of the certificates for the purpose stated is in violation of Section 10, Article IX of the Constitution.
I treat both aspects of the question together. The second aspect may be answered by determining whether the proceeds of the certificates are to be used for a public or a private purpose. It is clear that the purpose of Chapter 59-1903 was to authorize the Authority to encourage projects, enterprises and other developments in aid of the economic and general welfare of Suwannee County. The Authority was created by Chapter 59-1903, Special Acts of 1959, "for the purpose of performing such acts as shall be necessary for the sound planning for, and development of Suwannee county," for the public good and welfare of the county, its incorporated municipalities, and its or their inhabitants. The Authority is clothed with power to lease or purchase real property, to construct improvements thereon and to pay for same by the issuance of certificates or by using funds granted to it by the state, Suwannee County or its municipalities. The improvement project of the Authority includes those for development, expansion and promotion of industry, commerce, agricultural resources, vocational training and the construction of buildings and plants for the purpose of selling, leasing or renting such structures to private persons, firms or corporations. The Authority is not clothed with the power of eminent domain, or the taxing power, and it is expressly provided in Chapter 59-1903 that the Authority "shall not be empowered or authorized in any manner to create a debt as against the state, the county of Suwannee or any of the incorporated cities therein." Chapter 59-727, Special Acts of 1959, also authorizes the Authority, in carrying out its functions, to use a portion of the race track funds allocated annually to Suwannee County. No stronger proof that Chapter 59-1903, Special Acts of 1959, was designed to lift the economy and general welfare of Suwannee County out of the condition into which it had fallen can be pointed out than the finding of the chancellor validating the certificates wherein he found:
"Suwannee County is essentially a rural community. Tobacco, general farming and livestock are the principal activities in this respect. The County has no tourism, no substantial industry and no recreational facilities. Existing labor is unskilled and no means are available by which persons may be trained to become skilled craftsmen. As a result, there is a trend among the young of the County to move to other areas. The Development Authority has planned an extensive and comprehensive program which contemplates the construction of vocational training facilities, recreational development, industrial and commercial development and agricultural development. The proceeds from the sale of the certificates herein validated are to be used to finance an initial portion of the overall program of the Authority. At least a part of the proceeds from the sale of such certificates will be used to purchase property upon which will be erected an industrial plant to be leased to a private concern. The construction and leasing of such a building, while an integral part of the overall program, is, however, only a small part thereof. There is nothing in the record to show that this is the primary purpose of the Authority's program or the compelling motive for the issuance of the certificates herein validated. The contemplated use of a portion of the proceeds from the sale of the certificates is a part of the balanced overall plan for the County's development. Chapter 59-1903 is construed as authorizing the construction and leasing of an industrial plant to a private concern as a portion only of the overall county development program which encompasses recognized public purposes as the primary *196 object of the Development Authority."
Casual reading of Chapter 59-1903, Acts of 1959, discloses that its dominant purpose was to restore the depleted economy and general welfare of Suwannee County. The final decree of the chancellor emphasizes this purpose and the evidence abundantly reinforces the finding of the chancellor. It is appropriate to point out that at the turn of the century, the economy of Suwannee County was flourishing. It had good farming lands that produced staple crops and a large amount of Sea Island cotton. It had other lands that produced pine and hardwood timber.
Much of the land that produced the pine forests is now what is generally known as "cut-over lands," grown up in scrub pine and scrub oak, sometimes called pine barrons, producing nothing of value. Some of the farm lands have made their way into the Federal Land Bank while others are producing tobacco, corn, peanuts and other feed crops, but despite this, the economy of the county is so depleted that the young people grow up, leave for other parts to reside and better their condition and many of the farming class and other workers seek employment miles from home to supplement their subsistence. On the whole the population has shown a gradual decrease at each succeeding census, all of which presents a very discouraging economic picture.
With the proceeds of the certificates, appellee hopes to remove some of the gloom from this picture. At the argument to validate, it was charged that appellee was seeking to validate an issue of certificates before formulating a concrete plan on which to use the proceeds of the certificates. The evidence shows, however, that through the effort of appellee a furniture manufacturing plant and a wood-working plant have already been established in the county and are furnishing employment for many employees. It is further shown that appellee has been, and is, at present in communication with parties who want (1) to work in connection with the county school system to establish a vocational school program in order to prepare more skilled workers for small industries; (2) to work with a company which is interested in locating a textile mill in Suwannee County; (3) to cooperate with the appropriate state and federal agencies with the view of establishing rental units to induce elderly people to locate in Suwannee County; (4) to work on a plan to establish recreational facilities along the Suwannee River; (5) since power machinery has made radical changes in farming conditions, appellee is devising means to meet this change and to improve marketing conditions.
It is shown that the Suwannee River, famed in song and legend, lies along three sides of Suwannee County, like a four-inhand tie around one's neck, and that it traverses a beautiful rolling country, the potential of which no one has yet discovered. It may well be that as many eyes as there are focussed on Florida, as many people as want to come here, as bright as the sun shines with its recuperative power and reputation as a germicide, the touch of the hand of some wise developer gifted with plenary sales talk will make Suwannee County's "cut-over lands" and dormant resources double, treble and quadruple in value so fast that it will stifle the oldtimer's imagination. That is what happened to the custard apple flats, the bay bottoms, the sand bars and the sawgrass marshes on the lower east and west coasts within the memory of the youngest justices on this court.
In State ex rel. Ervin v. Cotney, Fla. 1958, 104 So.2d 346, 349, we were confronted with a question very similar to what we have in this case. We held that the act in question would "serve a valid public purpose in providing for the over-all development of Clay County." We further held, speaking of the same act that, at page 349:
"When construed as authorizing the sale or lease for industrial and commercial purposes of a portion, only, of a *197 tract of land acquired as a single project encompassing recognized public purposes as the primary object of the acquisitions; or as authorizing the construction of improvements on such property for utilization by private enterprises as an incident to and in furtherance of a primary and recognized public purpose, cf. Gate City Garage, Inc., v. City of Jacksonville, supra, 66 So.2d 653; Panama City v. State, supra, 93 So.2d 608, we find no constitutional infirmities in the Act."
No question is raised as to power of the Authority to issue revenue anticipation certificates. It is my view that the proceeds of the certificates are to be used for a public rather than a private purpose. Appellant's primary reliance to overthrow the decree of the chancellor validating the certificates is State v. Town of North Miami, Fla. 1952, 59 So.2d 779. It also places great reliance on City of West Palm Beach v. State, Fla. 1959, 113 So.2d 374; City of Clearwater v. Caldwell, Fla. 1954, 75 So.2d 765, and Adams v. Housing Authority of City of Daytona Beach, Fla. 1952, 60 So.2d 663.
I have examined these cases but their factual background is so different from the instant case that I do not think they can be said to control it. I am constrained to agree with the chancellor that State ex rel. Ervin v. Cotney, supra, concludes the case at bar. I am convinced that the proposed acquisition of land and construction of a building thereon to be leased to an industrial company is a portion only and a very small portion of the overall county development program, which encompasses recognized public purposes as the primary object of the Authority, and that the program does not constitute an attempt to pledge the credit of a public corporation in contravention of Section 10, Article IX, Constitution. Chapter 59-1903, Acts of 1959, appears to have been copied from Chapter 57-1226, Acts of 1957, out of which the Cotney case arose. That portion of Chapter 57-1226, Acts of 1957, held to be unconstitutional in the Cotney case, was omitted from Chapter 59-1903, and since I find no other constitutional infirmity, the Cotney case may be said to rule this case.
The second question raised by appellant challenges the power of the Authority to pledge to retirement of the proposed certificates a portion of the race track funds due Suwannee County under § 550.13, Florida Statutes, F.S.A.
Chapter 59-727, Laws of Florida, Special Acts of 1959, specifically provides that a portion of the race track funds allocated annually to Suwannee County under § 550.13, Florida Statutes, F.S.A., is to be paid into a revolving fund to be known as the Suwannee County Development Fund for use by the authority in carrying out its functions. It is from such fund that the certificates herein sought to be validated are to be paid. Section 9(7), Chapter 59-1903, Special Acts of 1959, the law creating the Authority, provides that the cost of any project, self-liquidating or otherwise, may be paid from the proceeds of revenue-anticipation certificates of the Authority or from any grant from the County of Suwannee or any of the incorporated cities therein, or from any grant from the state, or from any contribution or loan by persons, firms or corporations, all of which the Authority is empowered to receive, accept and use. See Section 9(12) which also provides for revenue-anticipation certificates to pay for projects.
Appellant contends that none of these acts expressly authorizes the pledging of race track funds to pay the proposed certificates and that if said certificates are allowed to be issued pledging such funds, the legislature will be committed to that policy in the future and will not be able to revoke its action. It is also urged that "revenue-anticipation" contemplates a self-liquidating project for which other funds cannot be pledged. The answer to this contention is that Chapter 59-1903 does not discuss the meaning of "revenue-anticipation" certificates, though in § 2 it defines numerous *198 other terms used in the act. Furthermore, § 12 directs that since the act is for the purpose of developing and promoting the public good and welfare of the County of Suwannee and the incorporated cities therein and their inhabitants, it shall be liberally construed to effectuate its purpose. When read together, as they must be, I think that the acts require no such interpretation as contended by appellant. On the contrary, I think that said acts were intended to permit the Authority to accomplish its purpose in the very manner attempted herein and that the pledge of race track funds is clearly authorized. See Posey v. Wakulla County, 1941, 148 Fla. 115, 3 So.2d 799.
After all is said, it is apparent that the economy of Suwannee County had gotten in a bad way. Its people were casting about for means to revive it. They adopted the plan defined in Chapter 59-1903, Special Acts of 1959. It is, of course, an experiment but if the means employed are lawful, it is not within the province of this court to say nay. Posey v. Wakulla County, supra; Prescott v. Board of Public Instruction, 1947, 159 Fla. 663, 32 So.2d 731; State v. St. Johns County, Fla. 1952, 60 So.2d 530, and State v. County of Santa Rosa, Fla. 1958, 105 So.2d 365, support this view. Experiments designed to restore a sagging economy to encourage the growing population to remain at home and build better schools, churches, roads and other institutions, to induce more people to come and make their homes in Suwannee County are always in order. These things contemplate more industries, more avocations that carry good jobs, jobs that enable the holder to pay his taxes, feed his family on good rations, clothe his children well, house them comfortably and enjoy his coffee break every morning. These are as elemental desires as air and water and must have been first in the minds of those who conceived Chapter 59-1903, Special Acts of 1959, "for the purpose of performing such acts as shall be necessary for the sound planning for, and development of Suwannee county."
I find no constitutional objection to the certificates; they are for a public purpose; such portion of them as may be used for a private purpose is incidental.
I would affirm the decree of the chancellor.