480 So.2d 639 (1985)
Thomas M. WOHL, et al., Appellants,
v.
STATE of Florida, et al., Appellees.
No. 67668.
Supreme Court of Florida.
December 19, 1985.
*640 John R. Bush and Susan B. Morrison of Bush, Ross, Gardner, Warren & Rudy, Tampa, for appellants.
Dennis R. Ferguson, William S. Dufoe and Julian D. Clarkson of Holland & Knight, Tampa, for appellees.
OVERTON, Justice.
This is a direct appeal from a final judgment validating revenue bonds of the Sebring Utility Commission. We have jurisdiction, article V, section 3(b)(2), Florida Constitution, and we affirm the final judgment validating the bonds.
The Sebring Utility Commission is authorized by law to operate the utilities of the City of Sebring and seeks to validate revenue bonds not exceeding $130 million. Acting under its charter authority to issue revenue bonds and certificates, the Commission adopted a Master Bond Resolution for Utilities System Revenue Bonds (Series 1985A) in an aggregate original principal amount not to exceed $130 million for the purpose of refunding and providing payment for previous outstanding bond and note obligations of the Commission. Specifically, the Series 1985A bonds were to redeem and repay $97.5 million Utilities System Revenue Bonds (Series 1981), $1.8 million Utilities System Subordinate Capital Appreciation Bonds (Series 1984), and $2.35 million Utilities System Subordinate Revenue Notes (Series 1985).
Appellants, who are ratepayers of the Commission,[1] argue that the charter sections governing the Series 1985A bond transaction require voter approval of the sale of revenue bonds in order to secure such borrowing. While conceding that section 12.04 of the Commission's charter permits issuance of revenue bonds by resolution where the bonds are solely for "refunding" outstanding bond issues, appellants contend that the 1985 Master Bond Resolution does not provide for the issuance of true "refunding" bonds. Appellants assert that the Series 1985A bond issue will increase the obligations of the ratepayers by enlarging the debt created by the Series 1981 and Series 1984 bonds and the Series 1985 notes. Appellants also object that the Series 1985A bonds will not immediately redeem the Commission's outstanding obligation, and they maintain that the language of the resolution authorizing issuance of additional bonds for construction and acquisition precludes characterization of the Series 1985A bonds as refunding bonds under the charter. Thus, according to appellants, the Series 1985A bonds cannot be deemed refunding bonds and should therefore be subject to approval by the voters at a special referendum election.
Rejecting appellants' contentions and finding the Series 1985A bonds were refunding bonds, the circuit court validated the Commission's bond issuance. The scope of review by this Court in bond validation cases is limited. The purpose of bond validation proceedings and the scope *641 of judicial inquiry held pursuant to chapter 75, Florida Statutes (1983), is to determine if a public body has the authority to issue such bonds under the Florida constitution and statutes, to decide whether the purpose of the obligation is legal, and to ensure that the authorization of the obligations complies with the requirements of law. McCoy Restaurants, Inc. v. City of Orlando, 392 So.2d 252 (Fla. 1980); State v. City of Miami, 379 So.2d 651 (Fla. 1980); State v. Sarasota County, 372 So.2d 1115 (Fla. 1979); State v. City of Sunrise, 354 So.2d 1206 (Fla. 1978). The final judgment validating the Commission's revenue bonds comes to the Court with a presumption of correctness, and appellants must demonstrate from the record the failure of the evidence to support the Commission's and the trial court's conclusions. International Brotherhood of Electrical Workers v. Jacksonville Port Authority, 424 So.2d 753 (Fla. 1982).
We reject the contentions that the Series 1985A bonds (1) are subject to a referendum before they may be sold and (2) are not refunding bonds under the charter provisions. First, sections 12.01 and 12.02 of the charter originally enacted by chapter 27893, Laws of Florida (1951), authorized the Sebring Utilities Commission to issue revenue bonds but only upon the "approval of the freeholders owning real estate" in Sebring.[2] These sections of the charter were amended by section 3 of chapter 63-1926, Laws of Florida, which provides:
This Act shall be construed to authorize the issuance of revenue bonds or certificates subject to approval of the freeholders when required under the constitution of the state and shall not be construed to be in conflict with the general law of the state authorizing the issuance of revenue bonds or certificates payable solely from the municipal utilities revenues.
The trial court in this case, consistent with prior court decisions validating other bond issues, construed the 1963 act as eliminating "any requirement of voter approval of proposed revenue bond issues unless required by the constitution of this state." We fully agree with the trial court. There would have been no need to enact the 1963 amendment if the referendum provision for revenue bonds would still remain intact in the charter. To so hold would render the 1963 amendment a useless act by the legislature.
Even without the 1963 amendment, section 12.04 of the charter expressly authorizes refunding bonds to be sold without referendum. Section 12.04 of the charter provides:

Issuance of Refunding Bonds or Certificates. The Sebring Utilities Commission shall be, and is hereby fully authorized and empowered, for the purpose of refunding any revenue bonds or certificates theretofore issued, to issue refunding *642 revenue bonds or certificates. The issuance of any such refunding bonds or certificates may be authorized by resolution which may be adopted at the same meeting at which it is introduced by a majority of all members of said Commission then in office and shall take effect immediately upon its adoption and need not be published or posted, nor shall the issuance of such refunding revenue bonds or certificates require the approval of freeholders owning real estate within said City of Sebring and who are also qualified to vote in any general election of said City to ratify and approve the same.
We also fully agree with the trial judge that the Series 1985A bonds are refunding bonds.
We find that the Commission is authorized to issue the Series 1985A bonds and has taken all the required steps for the issuance of the bonds in compliance with the applicable provisions of law. In accordance with the Commission's charter, the Series 1985A bonds are authorized as refunding bonds and may be issued without referendum approval. Contrary to appellants' contention, the only authorized purpose of the bonds is the refunding of the outstanding bonds and notes by payment of those obligations at their maturity or at such earlier time as the Commission is permitted under the terms of the outstanding securities.
Appellants' other challenges concerning the Series 1985A bonds are without merit and do not warrant further discussion. Appellants' assaults on the validity of the Series 1981 and Series 1984 bonds and the Series 1985 notes raise collateral issues and, therefore, are inappropriate matters for this bond validation proceeding. Zedeck v. Indian Trace Community Development District, 428 So.2d 647, 648 (Fla. 1983); McCoy Restaurants v. City of Orlando, 392 So.2d at 253.
Accordingly, we approve the final judgment validating the Series 1985A bonds.
It is so ordered.
BOYD, C.J., and ADKINS, McDONALD and EHRLICH, JJ., concur.
SHAW, J., dissents with an opinion.
SHAW, Justice, dissenting.
Appellant seeks review of an order validating the issuance of $130 million in revenue bonds by the Sebring Utilities Commission. Prior to discussing the issues raised by appellant and my disagreement with the majority, it is useful to examine some of the background to this bond validation.
In 1978, the Commission issued revenue bonds totaling $8.4 million (Series 1978). In 1981, the Commission issued additional revenue bonds totaling $92,750,000 (Series 1981). The Series 1981 bonds were for the purpose of paying or redeeming approximately $8.1 million owed on the Series 1978 bonds and for paying for a portion of the cost of "the Project (as defined in the 1981 Resolution)." The project was an expansion of electrical generating facilities and consumed the largest part of the bond issue. Apparently, utility revenues were inadequate to meet the interest due on the Series 1981 bonds and, in 1984 and 1985 the Commission issued additional revenue bonds of $1.8 million and $2.35 million, Series 1984 and 1985, respectively, for the purpose of paying a portion of the interest due on the previously borrowed money and for current operating expenses.[1] The Series 1981, 1984, and 1985 bonds were validated in circuit court and no appeal was made to this Court. The validity of these bonds is not at issue in this cause.
The Sebring Utility Commission was created by law[2] as a part of the government *643 of the City of Sebring to operate the utilities of the city. In 1951, the charter was amended to authorize the issuance of revenue bonds, subject to voter approval:

Section 12.01. The said Utilities Commission, subject to the approval of the freeholders owning real estate situate in the City of Sebring, Highlands County, Florida, and who are also qualified to vote at any general election of said City, such approval to be expressed and evidenced as hereinafter set forth, are hereby fully authorized and empowered without limitation as to amount, or as to maturities, to borrow money and to issue revenue bonds or certificates securing the money so borrowed for operating expenses, cost of alterations, repairs, construction, or acquisition of repairs, additions, extensions, or improvements of said municipal utilities.

Section 12.02. No resolution or resolutions adopted by the Sebring Utilities Commission authorizing the borrowing of money and the issuance of revenue bonds or certificates, shall, except as hereinbefore expressly otherwise provided, take effect unless and until the borrowing of said money and the issuance of said revenue bonds or certificates, as provided in said resolution or resolutions, has been approved by the freeholders owning real estate situate within the City of Sebring, Highlands County, Florida, and who are also qualified to vote at any general City election of said City, at a special election called by said Commission to determine whether or not said resolution or resolutions and the borrowing of money or moneys and the issuance of revenue bonds or certificates, as provided herein, is approved by a majority of said freeholders and voters, as above defined, voting as said special election.
In 1963, the charter was amended by adding a section purporting to construe the authority of the Commission to issue revenue bonds:
Section 3. Construction of Act.  This act shall be construed to authorize the issuance of revenue bonds or certificates subject to approval of the freeholders when required under the constitution of the state and shall not be construed to be in conflict with the general law of the state authorizing the issuance of revenue bonds or certificates payable solely from the municipal utilities revenues.
The effect of the 1963 amendment (section 3) on sections 12.01 and 12.02 is at issue. The trial court found that the amendment effectively rescinds the requirement for a referendum on revenue bonds issued by the Commission. I cannot agree. First, the language of sections 12.01 and 12.02 is unambiguously plain: a referendum is required. Second, the meaning of the 1963 amendment is decidedly ambiguous. It simply states that the act will not be construed contrary to the constitution or the general laws of Florida. So read, there is no conflict between the amendment and sections 12.01 and 12.02. The legislature, which adopted the special act, and the voters, who approved it, could and did, in their wisdom, decide that a referendum is required to issue revenue bonds even though it is not required by the constitution or the general laws of Florida. Appellees have cited no provision of the constitution or general law which prohibits referendums on revenue bond issues. In fact, the law is to the contrary. See section 132.24, Florida Statutes (1983), which recognizes that even though a referendum on a refunding issue may not be constitutionally required, "it may be called, noticed and conducted, and the result thereof determined and declared." Third, if the legislature wished to rescind the requirement for a voter referendum, it could have, and should have, presented the voters with a straight-forward amendment to sections 12.01 and 12.02 stating that referendums were only required when provided for by the constitution or general law. The legislative construction does not accomplish this result. It merely articulates the obvious: revenue bonds issued by the Commission must meet constitutional muster and must *644 comply with the general laws of the state.[3] Sections 12.01 and 12.02 meet these criteria notwithstanding the requirement that revenue bonds issued pursuant thereto must have voter approval. The 1963 amendment does nothing to change this. I would therefore hold that the Commission's charter requires voter approval of the Series 1985A bonds.
I also disagree with the trial court finding, and the majority holding, that the bonds are "refunding" bonds and, for that reason, may be issued without a referendum.[4] This is a decidedly pernicious application of the word "refunding." The Series 1981, 1984, and 1985 bonds total $96.9 million; the refunding bonds are for $130 million, an increase of over $33 million, or 34%, in added indebtedness. If "refunding" is to be a device for incurring additional indebtedness without voter approval, the provisions in article VII, sections 11 and 12 of the Florida Constitution will be nullified. Section 11 provides that full faith and credit bonds of the state may be issued subject to voter approval, but that such bonds may be refunded without voter approval at lower interest rates. Section 12 has the same provisions for local bonds. The majority's application of refunding would permit a government body to obtain voter approval on a bond issue of determinate size and thereafter to increase the bonded debt as it chose without approval of the voters, subject only to obtaining a lower interest rate on the refunded debt.
In my view, the majority's application of "refunding" is contrary to the constitution. It is also contrary to sections 132.11, 132.14, and 215.79(2), Florida Statutes (1983), all of which bear on the question of the amount to be refunded, redeemed, or exchanged. Section 132.11, entitled Amount of refunding bonds to be sold, limits the amount to that "necessary to provide for the matured bonds and legally incurred interest and of such unmatured bonds as the holders thereof have agreed in writing to surrender." Section 132.14, entitled Exchange in lieu of sale, states "[t]he principal and accrued interest of the refunding bonds shall not exceed the amount of the obligations refunded." Section 215.79(2), entitled Refunding bonds, permits an increase in the amount to be refunded to cover "costs and expenses of the issuance of such [refunding] bonds" and to deposit in escrow an amount sufficient to cover accrued interest and redemption premiums on the redeemed bonds, in which instance the interest on the escrowed money is available to offset the refunding, interest, and redemption costs.
Simple arithmetic suggests that the Commission had some purpose other than simply refunding $96.9 million in bonds when it adopted a resolution to issue $130 million in new bonds. A review of the bond resolution reveals that this purpose is to establish a new fund, the Renewal and Replacement Fund, which has no relationship to refunding. The Renewal and Replacement Fund consists of two accounts: (1) Renewal and Replacement Account and (2) Emergency and Facilities Account. The amount to be deposited in the Renewal and Replacement Fund, and the two sub accounts, is not set forth in the resolution but the apparent intent is to fund the sinking fund accounts necessary for advance refunding of the $96.9 million in outstanding bonds and to place the remaining $25-$33 million[5] in the two sub accounts of the Renewal and Replacement Fund. Section 509(b) of the resolution states that the purpose of *645 the Renewal and Replacement Account is to pay
the cost of renewals and replacements and the cost of acquiring, installing or replacing equipment and engineering, legal and administrative expenses relating to the foregoing and the cost of providing a local share of moneys required to enable the Commission to participate in the joint acquisition of property or the financing thereof with any private or public corporation or individual or to enable the Commission to receive federal or state grants or participate in federal or state assistance programs related to the system.
Section 509(c) states that the purpose of the Emergency and Facilities Account is to pay the
cost of unusual or extraordinary maintenance or repairs, renewals, replacement, repairs or other expenses resulting from an emergency, some extraordinary occurrence or for any purpose authorized by paragraph (b) whenever funds held for the credit of the Renewal and Replacement Account and other available funds of the Commission are insufficient for such purpose.
The inescapable conclusion is that this is not a simple refunding of outstanding bonds which "merely renews and continues in a changed form the original existing indebtedness." Davis v. Dixon, 98 Fla. 87, 91, 123 So. 536, 538 (1929).[6] This bond issue entails a considerable increase in Commission indebtedness. As it did in issuing the Series 1984 and 1985 bonds, the Commission is continuing the practice of financing current operating expenses by issuing long term debt. Whatever the merits of this practice from a business judgment viewpoint, a referendum is required by sections 12.01 and 12.02 of the Commission charter.
I would reverse the order below and declare the bonds invalid.
NOTES
[1] Appellants were intervenors before the trial court.
[2] Section 12.01 and the relevant portion of section 12.02 of chapter 27893, Laws of Florida (1951), read as follows:

Section 12.01. The said Utilities Commission, subject to the approval of the freeholders owning real estate situate in the City of Sebring, Highlands County, Florida, and who are also qualified to vote at any general election of said City, such approval to be expressed and evidenced as hereinafter set forth, are hereby fully authorized and empowered without limitation as to amount, or as to maturities, to borrow money and to issue revenue bonds of certificates securing the money so borrowed for operating expenses, cost of alterations, repairs, construction or acquisition of repairs, additions, extensions or improvements of said municipal utilities.
Section 12.02. No resolution or resolutions adopted by the Sebring Utilities Commission authorizing the borrowing of money and the issuance of revenue bonds or certificates, shall, except as hereinbefore expressly otherwise provided, take effect unless and until the borrowing of said money and the issuance of said revenue bonds or certificates, as provided in said resolution or resolutions, has been approved by the freeholders owning real estate situate within the City of Sebring, Highlands County, Florida, and who are also qualified to vote at any general City election of said City, at a special election called by said Commission to determine whether or not said resolution or resolutions and the borrowing of money or moneys and the issuance of revenue bonds or certificates, as herein provided, is approved by a majority of said freeholders and voters, as above defined, voting at said special election.
[1] Long term borrowing to meet current operating expenses and to pay interest due on previous bonds speaks volumes about the financial condition of the utility. The more prudent approach is that contained in article VII, section 11(c), Florida Constitution, which limits revenue bonds to capital projects.
[2] Ch. 23535, Laws of Florida (1945); amended ch. 27893, Laws of Florida (1951); amended ch. 63-1926, §§ 1-2, Laws of Florida; amended ch. 67-2068, §§ 1-3, Laws of Florida; amended ch. 79-567, §§ 1-9, Laws of Florida.
[3] The majority suggests that reading the legislative construction as written would render the 1963 amendment a useless act. That may be, but it is not justification for taking an empty vessel and giving it a meaning which nullifies the unambiguous sections of the charter requiring referendums. I repeat that if the proponents wanted to rescind the charter requirements for referendums, they should have submitted to the voters for their approval an amendment which unambiguously rescinded the voters' right to approve bond issues.
[4] Section 12.04 of the Commission Charter permits refunding of bonds without a referendum.
[5] We are told that costs for investment banker commission and bond issuance approximates $8 million.
[6] I note that the majority opinion has no explanation of how the Renewal and Replacement Fund has any relevance to "refunding" nor does the opinion discuss the impact on the constitution and general law of using "refunding" as a "wild card" device to increase indebtedness without voter approval.