QUINCE, J.
This case is before the Court on appeal from a circuit court judgment validating a proposed bond issue. We have jurisdiction. See art. V, § 3(b)(2), Fla. Const. For the reasons expressed below, we affirm in part and reverse in part the circuit court’s judgment.
FACTUAL AND PROCEDURAL HISTORY
In October 2008, the South Florida Water Management District (the District), filed a complaint in the Fifteenth Judicial Circuit seeking validation of certificates of participation (COPs), pursuant to Chapter 75 of the Florida Statutes, in order to purchase land owned by the United States Sugar Corporation for the purpose of Everglades restoration. The court issued a notice and order to show cause and scheduled a hearing for December 12, 2008. After the District filed a supplemental complaint, the trial court issued an amended notice and order to show cause, which retained the December 12 hearing date. The state attorneys for each of the judicial circuits within the District’s jurisdictional boundaries (Ninth, Tenth, Eleventh, Fifteenth, Sixteenth, Seventeenth, Nineteenth, and Twentieth Circuits) responded to the complaint on various dates. On December 11, 2008, the New Hope Sugar Company and Okeelanta Corporation (hereinafter collectively referred to as New Hope) served an answer and a memorandum in opposition to the complaint. The parties appeared before the court on December 12 and the court granted the District’s motion to continue the hearing. The court subsequently entered a second amended notice and order to show cause, rescheduling the bond validation proceeding for February 6, 2009.
In January 2009, several other parties appeared in the cause. On January 9, 2009, United States Sugar Corporation (U.S. Sugar) served a notice of appearance and motion to intervene as a party defen *816 dant. On January 12, 2009, Dexter Lehti-nen, already a defendant in his individual capacity, served a notice of appearance and answer on behalf of the Miccosukee Tribe of Indians of Florida (the Tribe). Other individuals and the Concerned Citizens of Glades also filed notices of appearance and answers to the complaint. The National Audubon Society and Florida Audubon Society served a notice of appearance and a notice of intervention. Accelerated discovery proceedings took place between December 2008 and February 2009. Various motions and memoranda of law were filed by the parties in February 2009.
The validation hearing was held over a number of days in February, March, July, and August of 2009. Counsel appeared on behalf of the District, New Hope, the Tribe, the state attorneys, Concerned Citizens of Glades, the Audubon Society, Nathaniel P. Reid, and U.S. Sugar. In the midst of these proceedings, various parties filed motions to abate the proceedings and reopen them for the court to consider new evidence regarding a modification of the transaction, which the court granted. The parties engaged in more expedited discovery and filed more motions during this time.
On August 26, 2009, the circuit court issued its final judgment, validating the COPs in the amount of $650 million, an amount sufficient to purchase 73,000 acres of property from U.S. Sugar. The order contained eight pages of factual findings and sixteen pages of legal conclusions. The court found that the District’s responsibilities include restoring and cleaning up the Everglades ecosystem; the District’s Governing Board had adopted resolutions amending the District’s five-year plan to include acquisition of the U.S. Sugar lands, establishing a master lease-purchase program, and authorizing the issuance of COPs to finance these transactions; all of the meetings related to this matter had been open, public, and duly noticed. The court also found that under the master lease-purchase agreement, the District will purchase the property and ground lease the property to a nonprofit Leasing Corporation. In turn, the Leasing Corporation will lease back the property to the District, which will manage the property and make improvements to it. Under the agreement, the District must determine annually whether to appropriate funds to pay the Leasing Corporation for the annual rental of the property, and the District regains possession of the property at the end of the ground lease. Additionally, a Master Trust Agreement was executed to issue COPs and to hold the proceeds from the COPs in trust to pay the costs of acquiring, constructing, and installing facilities on the sites. The COPs are secured by the lease payments. The court concluded that the District has the legal authority to issue the COPs, that the COPs will serve a legal purpose (water storage and treatment), and that the issuance of the COPs complies with the requirements of law.
In June 2009, pursuant to sections 120.569 and 120.57, Florida Statutes (2009), and rule 28-106.201 of the Florida Administrative Code, New Hope requested a formal administrative hearing challenging the District’s purchase of land from U.S. Sugar. Later, the Tribe filed a similar request. The District consolidated the parties’ separate petitions for administrative hearing and dismissed them with prejudice for lack of standing. Both New Hope and the Tribe filed notices of administrative appeal, requesting that the district court grant them a formal hearing for their administrative law claim. The District filed an all writs petition, asking this Court to transfer the administrative appeals cases from the district court because the cases deal with the same issues presented *817 in the bond validation proceedings. We granted the petition and transferred the cases.[1]
In September 2009, the Tribe and New Hope filed separate notices of appeal regarding the bond validation proceeding. We granted the District’s unopposed motion to consolidate the two bond validation appeals. We heard oral argument from the parties in April 2010.
ISSUES AND ANALYSIS
The parties raise a- number of issues regarding the validity of the COPs, including: whether the trial court’s findings of fact are complete; whether the trial court should have considered the economic feasibility of the project to be funded by the COPs; whether the COPs serve a public purpose; whether the transaction violates various constitutional provisions; whether the proposed financing structure is legal; whether COPs may be issued to purchase an option to buy certain property in the future; and whether the District may legally convey purchased lands to municipalities.
Judicial inquiry in a bond validation proceeding, both at the trial court and this Court, is limited to determining: (1) whether a public body has the authority to issue the subject bonds; (2) whether the purpose of the obligation is legal; and (3) whether the authorization of the obligation complies with the requirements of law. See City of Gainesville v. State, 863 So.2d 138, 143 (Fla.2003). This Court reviews the “trial court’s findings of fact for substantial competent evidence and its conclusions of law de novo.” Id. (citing Panama City Beach Cmty. Redev. Agency v. State, 831 So.2d 662, 665 (Fla.2002), and City of Boca Raton v. State, 595 So.2d 25, 31 (Fla.1992)). The final judgment of validation comes to this Court clothed with a presumption of correctness. See Strand v. Escambia County, 992 So.2d 150, 154 (Fla.2008). Moreover, the appellants have the burden of demonstrating that the record and evidence fail to support the lower court’s conclusions. See Wohl v. State, 480 So.2d 639, 641 (Fla.1985). We consider the issues raised within this legal framework.

1. Findings of Fact and Economic Feasibility

The Tribe and New Hope argue that the factual findings made by the trial court in its order of final judgment are incomplete because the trial court failed to consider the economic feasibility of the project and because the court failed to recognize that the proceeds of the COPs will be used to purchase 73,000 acres from U.S. Sugar and not to finance infrastructure projects on the land.
In its conclusions of law in the final judgment, the trial court recognized that “the economic feasibility of the project is outside of its scope of review.” The court acknowledged that the Tribe and New Hope had made strong arguments that the project is economically impossible. The court also questioned the wisdom of seeking this large amount of COPs during the current economic times. However, the court stated that it was “bound by precedent which instructs that economic feasibility is collateral to bond validation proceedings” and cited a number of previous decisions by this Court that stand for this proposition. Ultimately, the court stated that it “cannot and does not base its deci *818 sion on whether the District will have the financing to actually complete a project of this magnitude.”
This Court has repeatedly explained that
the fiscal feasibility of a revenue project is an administrative decision to be concluded by the business judgment of the issuing agency. Such problems as the advisability of the project and its income potential, must be resolved at the executive or administrative level. They are beyond the scope of judicial review in a validation proceeding.
State v. Manatee County Port Auth., 171 So.2d 169, 171 (Fla.1965). In Town of Medley v. State, 162 So.2d 257, 258-59 (Fla.1964), we explained that the reasonableness and economic feasibility of the financing plan were “the responsibility and prerogative of the governing body of the governmental unit in the absence of fraud or violation of legal duty.” See also Washington Shores Homeowners’ Ass’n v. City of Orlando, 602 So.2d 1300, 1302 (Fla.1992) (stating that homeowners’ complaint as to advisability of project is “collateral to” and “beyond the scope of’ bond validation proceedings); State v. City of Sunrise, 354 So.2d 1206, 1210 (Fla.1978) (explaining that the Court cannot reach the question of whether the bond revenue plan is fiscally sound or whether the financing method was wise).
This Court has adhered to these limitations over the years. For example, in State v. School Board of Sarasota County, 561 So.2d 549, 553 (Fla.1990), we stated that “[questions of business policy and judgment are beyond the scope of judicial interference and are responsibility of the issuing governmental units.” Similarly, in State v. City of Daytona Beach, 431 So.2d 981, 983 (Fla.1983), we stated that “questions concerning the financial and economic feasibility of a proposed plan are to be resolved at the executive or administrative level and are beyond the scope of judicial review in a validation proceeding.”
The rationale that underlies the limited judicial review in bond validation cases was explained by this Court in Town of Medley, 162 So.2d at 259:
[T]he courts do not have the authority to substitute their judgment for that of officials who have determined that revenue certificates should be issued for a purpose deemed by them to be in the best interest of those whom they represent ....
A contrary holding would make an oligarchy of the courts giving them the power in matters such as this to determine what in their opinion was good or bad for a city and its inhabitants thereby depriving the inhabitants of the right to make such decisions for themselves as is intended under our system of government.
Indeed, “[t]he function of a validation proceeding is merely to settle the basic validity of the securities and the power of the issuing agency to act in the premises. Its objective is to put in repose any question of law or fact affecting the validity of the bonds.” Manatee County Port Auth., 171 So.2d at 171.
New Hope argues that there was no administrative determination of the economic feasibility of this plan. However, the Governing Board passed three separate resolutions authorizing this project, argued the merits of the project at various board meetings, and heard reports by District staff at a number of meetings and workshops. A reviewing court cannot go behind the resolutions of the Governing Board which authorized this project. Thus, we agree with the trial court’s conclusion that economic feasibility is beyond *819 the scope of judicial review in a bond validation proceeding.

2. Public Purpose

The Tribe and New Hope argue that the purpose of the obligation is not legal because the proceeds of the COPs will not be used for the purposes delineated by the District, but merely to buy land. They also argue that the public purpose cannot be discerned here because the District does not have specific projects planned for the various parcels of land to be acquired.
“This Court has held that ‘legislative declarations of public purpose are presumed valid and should be considered correct unless patently erroneous.’ ” Strand v. Escambia County, 992 So.2d 150, 156 (Fla.2008) (quoting Boschen v. City of Clearwater, 777 So.2d 958, 966 (Fla.2001)). In its resolution approving the purchase of the land from U.S. Sugar and the issuance of the COPs, the District’s Governing Board stated that the acquisition of the land
will serve a public purpose by increasing the water storage capability of the District to reduce harmful freshwater discharges from Lake Okeechobee to Florida coastal rivers and estuaries; improving the timing and quality of delivery of cleaner water to the Everglades ecosystem; preventing phosphorous from entering the Everglades ecosystem; eliminating the need for “back-pumping” water into Lake Okeechobee and improving the sustainability of agriculture and green energy production all as more particularly described in staff report entitled Summary of Benefits of the USSC Land Acquisition attached hereto as Exhibit A.
Resolution No. 2008-1027, at 8, Governing Board of the South Florida Water Management District (Oct. 9, 2008). The Summary of Benefits referred to in the Governing Board’s resolution was authored by two District directors and the District’s chief scientist. This report goes into great detail as to each of the benefits listed as a public purpose in the Governing Board’s resolution.
Additionally, the Legislature has declared that it is “necessary for the public health and welfare that water and water-related resources be conserved and protected” and that the “acquisition of real property for this objective shall constitute a public purpose for which public funds may be expended.” § 378.139(1), Fla. Stat. (2008). The Legislature has also given water management districts the authority to “issue revenue bonds to finance the undertaking of any capital or other project for the purposes permitted by the State Constitution” and “to pay the costs and expenses incurred in carrying out the purposes of this chapter.” § 373.584(1), Fla. Stat. (2008). In fact, the Legislature has provided that
[t]he powers and authority of districts to issue revenue bonds ... shall be coextensive with the powers and authority of municipalities to issue bonds under state law. The provisions of this section constitute full and complete authority for the issuance of revenue bonds and shall be liberally construed to effectuate its purpose.
§ 373.584(2), Fla. Stat. (2008).
For purposes of section 373.584, the definition of a project is broadly defined as
a governmental undertaking approved by the governing body of a water management district and includes all property rights, easements, and franchises relating thereto and deemed necessary or convenient for the construction, acquisition, or operation thereof, and embraces any capital expenditure which the governing body of a water management district shall deem to be made for a public *820 purpose, including the refunding of any bonded indebtedness which may be outstanding on any existing project.
§ 373.584(4)(b), Fla. Stat. (2008). “Works of the district” are also broadly defined in chapter 373 as “those projects and works, including, but not limited to, structures, impoundments, wells, streams, and other watercourses, together with the appurtenant facilities and accompanying lands, which have been officially adopted by the governing board of the district as works of the district.” § 373.019(26), Fla. Stat. (2008).
Thus, the District has authority to acquire lands to further the objective of conserving and protecting water and water-related resources. This objective has been deemed a “public purpose” by the Legislature. The District can also issue revenue bonds to finance the costs of carrying out its responsibilities and projects under chapter 373. Its authority to issue such bonds is coextensive with that of municipalities and is to be liberally construed so that it can serve its purpose. The lands upon which the District’s projects reside are part of its statutorily defined works. In fact, it would be impossible for the District to construct its projects without first acquiring the accompanying lands. These statutes provide ample evidence to satisfy the first prong of our review, i.e., whether the District has the authority to issue the subject bonds. See City of Gainesville, 863 So.2d at 143.
The Appellants cite this Court’s decision in State v. Suwannee County Development Authority, 122 So.2d 190 (Fla.1960), in support of their argument that no public purpose has been proven. In Suwannee County, the Development Authority sought validation of revenue certificates for the purchase of land and construction of buildings that would be leased to private businesses. Id. at 191. There were no definite plans as to what land would be purchased with the proceeds from the sale of the certificates, what buildings would be constructed, or what firms would lease the buildings. Id. The Development Authority intended to devise the program after the validation. Id. On review, this Court explained that in order to determine whether an agency may lawfully expend the bond proceeds for the contemplated purpose, the issuing governmental agency should set forth in the petition for validation “a description of the purpose for which the proceeds are to be used, which description should be sufficiently detailed to enable a member of the public and the state to determine whether the issuing agency can lawfully expend public monies therefor.” Id. at 193. Thus, “petitions for validation of bonds and revenue certificates should set forth in reasonable detail the purpose or purposes which will be accomplished with the proceeds.” Id. at 194.
The complaint for validation and two supplements to the complaint that were filed in this case describe the land to be acquired with the proceeds of the COPs and the structure of the financing agreement. The complaint also states that the land will be used to further the District’s mandate to restore natural resources. Exhibits filed with the complaint include the Governing Board’s resolutions which authorize the land purchase, the issuance of COPs, and the financing structure; a report detailing the benefits to be derived from the land acquisition; a number of reports relating to the District’s projects and the Everglades restoration; and copies of the master lease-purchase agreement, the master trust agreement, the ground leases to be used for the leases between the District and the Leasing Corporation, the assignment agreement between the Leasing Corporation and the named trustee, and the COPs to be issued. *821 In all, well over 500 pages of exhibits were filed with the complaint for validation.
This is a far cry from the Suwan-nee County case, where the complaint did not specify what land would be purchased, what buildings would be constructed, and to whom the buildings would be leased. Here, the 78,000 acres have been identified. The land will be leased back to U.S. Sugar, which will be required to maintain the land as specified in the ground lease and to use best practices in its farming. The land will eventually house various water storage and treatment projects. At the July 13, 2009, evidentiary hearing, the District’s Executive Director specified the various projects and uses for each parcel of the 73,000 acres. In fact, it was the lack of such projects or planned uses for' the remaining 107,000 acres that caused the trial court to deny validation of COPs for the purchase of those additional acres.
This Court addressed a similar challenge based on the fáct that “plans and specifications of the proposed improvements were not offered in evidence by” the governmental entity seeking validation in Rianhard v. Port of Palm Beach District, 186 So.2d 503, 505 (Fla.1966). In that case, we concluded that the introduction of the supporting resolution, which “sufficiently describe[d] the purposes for which the funds derived from the sale of the certificates [would] be expended,” was “all that was necessary to justify validation.” Id. We reiterated this holding in Strand, when we stated that “the admission of a resolution may be sufficient evidence justifying a bond validation.” Strand, 992 So.2d at 156. There, the County offered into evidence its ordinance and resolution authorizing bonds for a road construction project and presented testimony concerning the purpose of the project and the financing mechanism. See id. at 155. We concluded that these legislative findings were “competent, substantial evidence sufficient to support the final judgment.” Id. at 156.
The same can be said in the instant case, where the trial court conducted nine days of evidentiary hearings resulting in thousands of pages of transcripts, heard testimony from numerous expert witnesses, and considered numerous evidentiary materials. The transcript contains numerous passages in which the trial judge questions witnesses to gain more information and asks the parties to clarify various issues. The trial court’s order of final judgment is comprehensive and well-documented. The arguments by the Appellants here do not meet the burden of “demonstrat[ing] from the record the failure of the evidence to support the [government body’s] and the trial court’s conclusions.” Wohl v. State, 480 So.2d 639, 641 (Fla.1985). The trial court’s final judgment of validation comes to this Court “clothed with a presumption of correctness.” Strand, 992 So.2d at 154 (citing Wohl, 480 So.2d at 641). We conclude that there is competent substantial evidence in the record to support the finding of a public purpose.

3. Constitutional Challenges

The Tribe and New Hope argue that the transaction is not valid because it does not comply with several provisions of the Florida Constitution. These include the prohibition in article VII, section 10 against using the state’s taxing power or credit to aid a private entity or person; the requirement of article VII, section 12 that voters must approve bonds or COPs which are payable from ad valorem taxation and mature more than twelve months after issuance; and the requirement in article VII, section 11 that bonds issued by the state or its agencies must first be approved by the Legislature through an act relating to appropriations or by general law. For the reasons explained below, we conclude that *822 the instant transaction does not violate any of these constitutional provisions.
a. Public Purpose Test of Article VII, Section 10
Article VII, section 10 of the Florida Constitution provides in pertinent part: “Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall ... give, lend or use its taxing power or credit to aid any corporation, association, partnership or person.... ” The Appellants contend that the land acquisition in this case violates this constitutional provision because the District is buying lands that will then be leased back to U.S. Sugar for a number of years, therefore not meeting the paramount public purpose test.
The basic test for determining whether an expenditure of public funds violates this section of the Florida Constitution is whether such expenditure is made to accomplish a public purpose. If the District has used either its taxing power or pledge of credit to support issuance of bonds, the purpose of the obligation must serve a paramount public purpose and any benefits to a private party must be incidental. See State v. JEA, 789 So.2d 268, 272 (Fla.2001) (citing State v. Osceola County, 752 So.2d 530, 536 (Fla.1999)). If the District has not exercised its taxing power or pledged its credit to support the bond obligation, the obligation is valid if it serves a public purpose. See id. at 272; Northern Palm Beach County Water Control Dist. v. State, 604 So.2d 440, 441-42 (Fla.1992). Incidental private benefit from a public revenue bond issue is not sufficient to negate the public character of the project. JEA, 789 So.2d at 272.
As used in article VII, section 10, “credit” means “the imposition of some new financial liability upon the State or a political subdivision which in effect results in the creation of a State or political subdivision debt for the benefit of private enterprises.” Jackson-Shaw Co. v. Jacksonville Aviation Auth., 8 So.3d 1076, 1095 (Fla.2008) (quoting Nohrr v. Brevard County Educ. Facilities Auth., 247 So.2d 304, 309 (Fla.1971)). This Court has explained that the lending of credit means:
[T]he assumption by the public body of some degree of direct or indirect obligation to pay a debt of the third party. Where there is no direct or indirect undertaking by the public body to pay the obligation from public funds, and no public property is placed in jeopardy by a default of the third party, there is no lending of public credit.
Id. (quoting State v. Housing Fin. Auth., 376 So.2d 1158, 1160 (Fla.1979)). Under this definition, we conclude that the COPs in this case do not contemplate a pledge of the District’s credit, and that only a public purpose, not a paramount public purpose, need be shown.
In its final judgment, the trial court concluded that the acquisition of the land would serve the public purpose of water storage and treatment. The trial court noted that the Governing Board had voted to approve the acquisition after much debate and that District witnesses had outlined, parcel by parcel, the immediate and future benefits to be gained by the land acquisition. The court found that the following benefits would be achieved: storage and treatment of water before it is pumped into Lake Okeechobee; additional storage and treatment facilities that will work in conjunction with Comprehensive Everglades Restoration Projects basins; and land that will be valuable for future land swaps.
Examples of valid “public purposes” that have been recognized by this Court rather broadly include an on-site road improvement project within a unit of a water con *823 trol district, see Northern Palm Beach County Water Control Dist., 604 So.2d at 443, the construction of an office building for a multistate insurance company, see Linscott v. Orange County Indus. Dev. Auth., 443 So.2d 97 (Fla.1983), and the purchase of mortgages from private homeowners to alleviate shortages in public housing, see State v. Housing Fin. Auth., 376 So.2d 1158 (Fla.1979).
“Under the constitution of 1968, it is immaterial that the primary beneficiary of a project be a private party, if the public interest, even though indirect, is present and sufficiently strong.” State v. Housing Fin. Auth., 376 So.2d at 1160. Further, public ownership of a project to be funded by bond revenues is a “significant factor in a finding of public purpose.” Northern Palm Beach County Water Control Dist., 604 So.2d at 443 (citing Orange County Indus. Dev. Auth. v. State, 427 So.2d 174, 179 (Fla.1983)).
In the instant case, the District will retain title to the lands acquired. The land will be leased back to the seller U.S. Sugar to continue its agricultural operations, which will generate revenues and maintain the land until the District can construct the infrastructure projects required for water storage and treatment for Everglades restoration. Because we conclude that the purchase of the property serves the public purposes of furthering Everglades restoration and the management of water resources, the requirements of article VII, section 10 are satisfied,
b. Voter Referendum Requirement of Article VII, Section 12
Article VII, section 12 of the Florida Constitution, provides:
Local bonds. — Counties, school districts, municipalities, special districts and local governmental bodies with taxing powers may issue bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad va-lorem taxation and maturing more than twelve months after issuance only:
(a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation; or
(b) to refund outstanding bonds and interest and redemption premium thereon at a lower net average interest cost rate.
The trial court concluded that the referendum requirement of article VII, section 12 does not apply in this case because the District’s obligation to make the lease payments is an annual obligation that does not extend more than twelve months and the lease payments are not payable from ad valorem taxation within the meaning of the constitutional provision. The trial court found that the arguments advanced by the Tribe and New Hope ignored the plain language of the Florida Constitution, the relevant Florida Statutes, the governing resolution and agreements, and this Court’s recent decision in Strand v. Escambia County, 992 So.2d 150, 157-59 (Fla.2008), in which this Court reaffirmed its long-held distinction between pledges of ad valorem taxing power and the use of ad valorem tax revenues. We agree.
In State v. Miami Beach Redevelopment Agency, 392 So.2d 875 (Fla.1980), we explained that a referendum is not required by article VII, section 12 when there is no direct pledge of the ad valorem taxing power. Although contributions may come from ad valorem tax revenues, “[w]hat is critical to the constitutionality of the bonds is that, after the sale of the bonds, a bondholder would have no right, if [funds] were insufficient to meet the bond obligations ... to compel by judicial action the levy of ad valorem taxation.” *824 Id. at 898. Where a governing body is not obliged and cannot be compelled to levy any ad valorem taxes, then the obligation is not “payable from ad valorem taxation” for purposes of article VII, section 12, and referendum approval is not required. Id.; see also State v. School Bd. of Sarasota County, 561 So.2d 549 (Fla.1990) (reaching same conclusion as to validity of bonds and COPs to be issued by several school boards for the construction of schools). We recently reaffirmed our adherence to this reasoning in Strand, when we rejected Strand’s motion on rehearing asking us to recede from the decision in Miami Beach as it relates to the meaning of “payable from ad valorem taxation” in article VII, section 12. Strand, 992 So.2d at 157-59.
The trial court found that the District has not pledged its ad valorem taxing powers to pay any sum under the lease agreement or any of the leases, cannot be compelled to levy any ad valorem tax to pay the lease payments, and cannot be compelled to pay any lease payments beyond one year. We agree. Under the terms of the Master Lease Purchase Agreement, the basic lease payments are payable only from funds appropriated by the Governing Board and are not payable “from any source of taxation.” The District has not pledged its “full faith and credit ... for payment of such sums.” Further, the agreement provides that “[njeither the [Leasing] Corporation, the Trustee, nor any certificate holder may compel the levy of ad valorem taxes by the Governing Board to pay the lease payments.” The District’s Chief Financial Officer also testified that the way the deal was structured, none of the certificate holders could ever compel the District to levy ad valorem taxes in order to pay the District’s obligations. Under the nonappropriation clause of the agreement, the obligations and liabilities are dependent upon appropriations being made by the Governing Board. Additionally, the Governing Board is free to terminate the lease annually without further obligation and the certificate holders are limited to lease remedies. The failure of the Governing Board to appropriate the sufficient funds for lease payments does not constitute a default, does not require payment of a penalty, and does not limit the District’s right to purchase or use facilities similar in function. Instead, the nonappropriation of the funds results in the termination of the lease, requiring the District to surrender possession of the facilities to the trustee for the remainder of the term of the ground lease. However, the fee title to the property remains in the name of the Governing Board. Thus, the terms of the agreement maintain the District’s “full budgetary flexibility.” State v. Brevard County, 539 So.2d 461, 464 (Fla.1989); see also Sarasota County, 561 So.2d at 553 (finding that “annual renewal option preserves the boards’ full budgetary flexibility”).
The Tribe and New Hope assert that this nonappropriation clause is illusory because the District cannot practically walk away from its obligation. They cite Frankenmuth Mutual Insurance Co. v. Magaha, 769 So.2d 1012 (Fla.2000), and Volusia County v. State, 417 So.2d 968, 969 (Fla.1982), in support of this argument. However, we find both cases to be distinguishable from the instant case.
Frankenmuth involved a master lease agreement for computer equipment to be used for county payroll and central data processing for the county offices. In addition to a nonappropriation clause that terminated the lease if the funding authority failed to appropriate funds to make the lease payments, the agreement also contained a nonsubstitution clause, providing that the county could not purchase or rent substitute computer equipment for two years in the event of nonappropriation. *825 See Frankenmuth, 769 So.2d at 1014-18. Although the agreement stated that there was no pledge of ad valorem taxes by the county and the county could not be compelled to appropriate funds to make the lease payments, we concluded that the nonsubstitution clause rendered the nonap-propriation clause illusory by compelling the county to make the lease payments or suffer the penalty of losing the computer equipment and not being able to substitute other computer equipment for two years. See id. at 1024. Thus, the county was “morally compelled] ... to pledge ad valo-rem taxes to fulfill the obligations of the lease.” Id. at 1026.
Similarly, in Volusia County, 417 So.2d at 972, the county pledged all available revenues and covenanted “to do all things necessary to continue receiving the various revenues” pledged in bonds for the construction of a new jail. We concluded that these two pledges would “inevitably lead to higher ad valorem taxes during the life of the bonds, which amounts to the same thing.” Id.
Here, the master lease agreement contains a nonappropriation clause that gives the District the right to terminate the lease on an annual basis if the Governing Board should decide not to appropriate the funds for the lease. As this Court explained in Frankenmuth, such nonap-propriation or nonrenewal clauses are “essential to prevent long-term municipal financing arrangements from being classified as debt under state law, thus triggering state-law requirements such as voter referendum.” 769 So.2d at 1024 (quoting Frankenmuth Mut. Ins. Corp. v. Magaha, 10 Fla. L. Weekly Fed. D340, D341, 1996 WL 571042 (N.D.Fla. Aug. 30, 1996)). Unlike Volusia County, there are no further pledges as to the source of revenues or efforts to maintain revenues. Unlike Frankenmuth, the only the penalties for nonappropriation are normal lease penalties, i.e., the District loses possessory interest for the term of the lease and this interest may be re-leased for the benefit of the certificate holders. At the termination of the lease, the District regains possession and it always retains title to the land. We conclude that this structure maintains the District’s budgetary flexibility and thus does not require a referendum under article VII, section 12.
However, the arrangement could run afoul of this constitutional provision if the District should include under the master lease any lands that have been financed through a pledge of its ad valorem taxing power. Under Resolution 2009-500A of the Governing Board, the “Certificates [of Participation] will be payable from basic lease payments to be made by the District under the initial lease Schedule related to the lease of the U.S. Sugar Lands or other lands it currently owns.” Resolution No. 2009-500A, at 2, Governing Board of the South Florida Water Management District (May 13, 2009) (emphasis added). The substitution of other lands that implicate a pledge of the District’s ad valorem taxing power would run afoul of the referendum requirement of article VII, section 12, and therefore such lands may not be substituted.
c. Legislative Approval under Article VII, Section 11(f)
Article VII, section 11 of the Florida Constitution governs state bonds and revenue bonds. Subsection (f) provides that “[e]ach project, building, or facility to be financed or refinanced with revenue bonds issued under this section shall first be approved by the Legislature by an act relating to appropriations or by general law.” This provision applies to bonds issued by “the state or its agencies.” Art. VII, § 11(d), Fla. Const. The trial court *826 concluded that the legislative approval was not required in this case because the District was not a state agency for purposes of article VII of the Florida Constitution. The trial court based this conclusion on the fact that article VII, section 1(a) of the Florida Constitution prohibits the state and its agencies from levying ad valorem taxes, while article VII, section 9(b) authorizes the levy of ad valorem taxes “for water management purposes” and for “all other special districts.” The court reasoned that because the District can and does levy ad valorem taxes, it cannot be deemed a “state agency” under article VII.
Water management districts have an “amorphous nature” in Florida law, being deemed state agencies or arms of the state for some purposes, but not for other purposes. Compare Fla. Sugar Cane League, Inc. v. South Fla. Water Mgmt. Dist., 617 So.2d 1065, 1066 (Fla. 4th DCA 1993) (explaining that the district is a “regulatory state agency” subject to Florida’s Administrative Procedure Act), with Martinez v. South Fla. Water Mgmt. Dist., 705 So.2d 611 (Fla. 4th DCA 1997) (determining that the District was not subject to the provisions of the Drug-Free Workplace Act because it was not a state agency). In this case the dispositive question is whether the District is a “state agency” for purposes of article VII, section 11(f), which would require legislative approval through general law or an appropriations act before the District could issue revenue bonds. In the past, we have concluded that water management districts are not included in the prohibition against state ad valorem taxation in article VII, section 1(a) of the Florida Constitution. See St. Johns River Water Mgmt. Dist. v. Deseret Ranches of Florida, Inc., 421 So.2d 1067, 1070 (Fla.1982) (concluding that ad valo-rem taxes levied by the district did not violate the constitutional prohibition against state ad valorem taxes because article VII, section 9 “specifically authorizes the levying of ad valorem taxes for water management purposes,” and section 378.503 of the Florida Statutes “provides the implementing legislation for ad valo-rem taxation to finance the works of the District”). While the Appellants are technically correct that Deseret Ranches did not hold that water management districts are not state agencies, we did recognize that the districts are not the “state” for purposes of finance and taxation under article VII of the Florida Constitution. See id.
Accordingly, we agree with the trial court’s conclusion that legislative approval is not required before the District can issue these certificates of participation.

4. Financing Structure

The Tribe asserts that the financing structure in this case is not legal. The trial court succinctly characterized the financing structure in its order of final judgment:
The District proposes to issue COPs pursuant to a classic, annual appropriation, lease-purchase structure that has been consistently approved by the Florida Supreme Court. Here, the District will purchase property which it will then ground lease to the Leasing Corporation. The Leasing Corporation will lease such property back to the District pursuant to the Master Lease Purchase Agreement. The District will manage such property and may make improvements thereto. Pursuant to Section 3.5 of the Master Lease Purchase Agreement, the District must annually determine whether to appropriate funds, which may include proceeds from ad valorem taxes, to pay the Leasing Corporation for the annual rental of such property. Each of these structural elements is similar to those present in *827 School Board of Sarasota County, where title to the public lands remained in the school boards, the ground lease was up to thirty years, and “[m]oney from several sources, including ad valorem taxation, [was] used to make the annual facilities lease payments.” School Bd. of Sarasota County, 561 So.2d at 551.
If, in any year, the District determines not to appropriate funds to make the annual rental payments, the Lease Term of all Leases under the Master Lease Purchase Agreement will terminate no later than the end of the District’s fiscal year for which the District appropriated funds to make the lease payments. Upon such termination, the District must immediately surrender and deliver possession of the property to the Trustee as assignee of the Leasing Corporation. The District surrenders possession only for the remaining period of the Ground Lease but does not surrender ultimate ownership of the property. At the end of the Ground Lease, the District regains possession of the property. During such period of the ground lease, the District may freely substitute other property for the property then controlled by the Leasing Corporation pursuant to the Ground Lease.
The Tribe argues, first, that the District has no authority to form and utilize the nonprofit Leasing Corporation, and second, that the financing structure is questionable under contract law because the leases between the District and the nonprofit Leasing Corporation are not supported by adequate consideration.
The first argument was rejected by the trial court, which concluded that government entities may create nonprofit corporations for the sole purpose of facilitating a COPs transaction. Indeed, in Leon County Educational Facilities Authority v. Hartsfield, 698 So.2d 526, 527 (Fla.1997), a nonprofit corporation was established solely for the purpose of facilitating the financing, acquisition, construction, and equipping of a project by the Authority to operate a dormitory and food service project to serve students at the local universities and colleges. The Authority entered into a lease-purchase agreement with the nonprofit corporation that was financed through the issuance of COPS. Similarly, in School Board of Sarasota County, 561 So.2d at 550-51, the school boards of several counties entered into lease-purchase agreements with nonprofit entities which were financed with COPs. Those agreements provided for the lease of public land owned by the boards to the nonprofit entities by way of ground leases, the construction or improvement of public educational facilities upon the leased lands and the annual leaseback of the facilities to the respective school boards by way of facilities leases, and the conveyance of the lease rights of the nonprofits entities to trustees by way of trust agreements. See id.
Section 373.584 of the Florida Statutes authorizes water management districts to issue revenue bonds. Section 373.584(2) gives water management districts powers and authority coextensive with municipalities to issue bonds under state law. In fact, this provision provides that the districts’ power and authority
to issue revenue bonds, ... and to enter into contracts incidental thereto, and to do all things necessary and desirable in connection with the issuance of revenue bonds, shall be coextensive with the powers and authority of municipalities to issue bonds under state law. The provisions of this section constitute full and complete authority for the issuance of revenue bonds and shall be liberally construed to effectuate its purpose.
*828 § 373.584(2), Fla. Stat. (2008). We conclude that under this broad grant of authority to “do all things necessary and desirable in connection with the issuance of revenue bonds,” id., the District has the ability to establish the nonprofit Leasing Corporation.
The order of final judgment does not mention the Tribe’s second argument regarding possible contract problems with the ground lease between the District and the leasing corporation due to lack of consideration. However, we would find no merit to the argument, as the ground lease provides that the Leasing Corporation will handle the matters related to the COPs and their issuance and the matters related to title of the land and the leases. Thus, the nonprofit Leasing Corporation is supplying valuable services in consideration for the lease of the lands by the District.

5. Purchase of Land Option

The purchase agreement between U.S. Sugar and the District contains an “Option to Purchase Real Property,” which gives the District an exclusive option to purchase an additional 107,000 acres for a period of three years after the closing date of the sale at a fixed price of $7400 per acre. During the following seven years, the provision gives the District a nonexclusive option to purchase the land at the appraisal value and the right of first refusal if U.S. Sugar sells the option land. There is no mention of a cost for this option in this section of the purchase agreement, only a listing of the cost per acre should the option be exercised. The parties disagree on whether the price to be paid for the 73,000 acres includes a cost for the option to purchase the additional 107,-000 acres of U.S. Sugar land. Additionally, the District asserts that this issue was not raised below by the Appellants and thus is not preserved for review by this Court.
The order of final judgment states that the District is “initially acquiring approximately 73,000 acres for approximately $536 million, with a $50 million option to acquire the remaining 107,000 acres later in time.” The record of the proceedings below is replete with evidence to support the trial court’s factual determination that the option to purchase the additional acreage will cost the District $50 million. The record also indicates that the Appellants raised the issue of the cost of the option during the hearing.
In various written responses and throughout the validation hearing, the Appellants asserted that the option to purchase the additional 107,000 acres would cost the District $50 million. The District never directly contradicted these assertions and, in fact, the testimony of several District witnesses tends to support the assertions. On redirect questioning, the District’s Deputy Executive Director in Charge of Everglades Restoration testified that the $50 million value of the option had been presented to the Governing Board. On cross-examination, the District’s Budget Director admitted that the $536 million purchase price “appeared” to include payment for the option. Although the District’s Executive Director would not assign a monetary value to the option, she admitted on cross-examination that an expert appraiser had “blended [the value of the option and the value of the land] together in a very intricate way.” Additionally, the District never disagreed with the judge’s characterization of the option as costing $50 million.
The record of the May 2009 Governing Board meeting also supports the conclusion that $50 million was being paid for the option. The District’s Director of Land Acquisitions testified that “the exclusive three-year option has a value the appraisers put in the marketplace of $50 million.” *829 When asked by a Board member whether the $50 million would be credited to the land cost if the option were exercised, the Director responded no and explained that the $50 million had to be paid to U.S. Sugar at the closing. She further explained that “the $50 million is part of the acquisition price, the 536.”
The record of the bond validation hearing also negates the District’s assertion that the Appellants never raised the issue of whether COPs can be used to purchase a land option. Counsel for both Appellants challenged the public purpose of the $50 million in COPs that would be spent on the option. The Tribe’s counsel argued that the option money would not be spent on anything tangible, that there was no public benefit because the District was merely .buying an opportunity, and that the taxpayers would be responsible for the $50 million debt even if the District never exercised the option. New Hope’s counsel made a similar argument in closing, questioning the public purpose of the $50 million option.
Based on the portions of the record described above, we find competent, substantial evidence to support the circuit court’s conclusion that the purchase agreement includes a $50 million cost for the option to purchase the remaining 107,000 acres of U.S. Sugar land. We also conclude that the issue of whether the option serves a public purpose was presented to the circuit court below and thus was properly preserved for our review. The circuit court found the record “essentially devoid of any information discussing how the remaining 107,000 acres (if acquired) would be utilized” and thus the legality of the bond validation as to that acreage could not be determined. Because no public purpose has been proven as to the land that is the subject of the option, no public purpose has been shown for the option either. Thus, we reverse that part of the circuit court’s order validating $50 million in COPs related to the land option.

6. Conveyance of Land to Municipalities

The Tribe argues that the transaction is illegal because the District plans to convey some of the acquired lands to local communities for economic development. The Tribe contends that the District does not have the legal authority to purchase land with the express purpose of conveying it to a local governmental entity and that a purchase for this purpose exceeds the District’s statutory authority to purchase land so that “water-related resources [may] be conserved and protected.” § 373.139(1), Fla. Stat. (2008). We find no merit to this argument.
The Legislature has given the District authority to convey land to a governmental entity. The statute specifically provides as follows:
Any water management district within this chapter shall have authority to convey or lease to any governmental entity, other agency described herein or to the United States Government, including its agencies, land or rights in land owned by such district not required for its purposes under such terms and conditions as the governing board of such district may determine.
§ 373.056(4), Fla. Stat. (2008). Additionally, section 373.089(1), Florida Statutes (2008), authorizes the District to sell lands that the Governing Board has determined to be surplus. Thus, there is no question that the District has the authority to convey land to local communities. Moreover, the statutory authorization to dispose of surplus land clearly indicates that water management districts may acquire more land than is ultimately required for a pro *830 ject. Cf. Dep’t of Transp. v. Fortune Fed. Sav. & Loan Ass’n, 532 So.2d 1267, 1269-70 (Fla.1988) (explaining that the state may take more property than necessary for a contemplated project when it would save money by doing so).
CONCLUSION
With the exceptions stated above, we conclude that the District has the authority to issue the certificates of participation for the purchase of the 73,000 acres from U.S. Sugar, that this obligation serves the public purpose of conserving and protecting water and water-related resources, and that the authorization of the obligation complies with the requirements of law. See City of Gainesville v. State, 863 So.2d 138, 143 (Fla.2003). However, because the purchase of the option does not serve a public purpose, COPs may not be issued to cover this expense. Further, to the extent that the substitution of other lands may implicate a pledge of the District’s ad valo-rem taxing power, such lands may not be substituted.
Accordingly, we affirm in part and reverse in part the circuit court’s order of final judgment validating $650 million in certificates of participation to finance the land acquisition.
It is so ordered.
CANADY, C.J., and PARIENTE, POLSTON, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in result only with an opinion.

. We consolidated the two administrative cases and reviewed them without oral argument. See New Hope Sugar Co. v. South Fla. Water Mgmt. Dist., No. SC10-330, 2010 WL 4709713 (Fla. Nov. 18, 2010), and Miccosukee Tribe v. South Fla. Water Mgmt. Dist., No. SC10-336, 2010 WL 4709713 (Fla. Nov. 18, 2010).